UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

A. EL-SABA                                    CIVIL ACTION NO. 15·87·KP·N

vs

UNIVERSITY OF                                 JUDGE:
    SOUTH ALABAMA                      Magistrate Judge:

## COMPLAINT

### Jurisdiction and venue

1.  Jurisdiction is based on Title VII and 28 USC sec. 1343. This action is brought under Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973, sec. 504. Venue in this district is proper because all conduct complained of occurred in this district.

### Parties

2.  Plaintiff is Aed El-Saba, a naturalized citizen of the United States. His DOB is June 26, 1961. His national origin is Lebanon and he became a naturalized citizen in 1991. Defendant is the University of South Alabama.

### Right-to-sue

3.  Plaintiff received two Right-to -sue letters both dated November 24, 2014. One pertains to Title VII of the Civil Rights Act of 1964 and the other to Title I of the ADA. However, the failure to accommodate count is brought under the

Rehabilitation Act of 1973.

## **Introduction**

4.     John Steadman, PhD, became Dean of the College of Engineering in 2003. Beneath him was the chairman of the Electrical and Computer Engineering (ECE) Department, M.S. Alam, PhD., who was plaintiff's immediate supervisor. Above them was Dr David Johnson, the Senior Vice-President for Academic Affairs.

6.     James Laier was the Associate Dean of the College of Engineering under Dean Steadman.

7.     Martin Parker was a full professor in the ECE Department and served on the College Tenure and Promotion (T&P) Committee as the Dean's representative; on the Department T&P Committee; and on the College Excellence in Research Award Committee as the Department representative.

8.     At the end of the 2006 academic year  plaintiff accused Dean Steadman of racial discrimination against middle eastern professors with respect to salary raises for the period 2004-06.  The accusation was made at a College General Meeting before about 25 professors.  During this meeting, Dr Steadman was asked to recuse himself, plaintiff made his complaint, other discussion was had, and a vote of non-confidence was tallied.

9.     The following day, Dean Steadman summoned ECE Chairman Alam to his office and asked him how he could allow one of his faculty, Dr El-Saba, to accuse

him of racism.

10.    In late 2006/early2007 Dean Steadman stated that he wanted to "change the demographics" of the ECE Department. In 2007/early 2008 he stated he would like to hire native born, natural English speaking faculty; and in late 2008 through Alam to the Search Committee that he "would prefer, all things being equal, to hire native born, natural English speaking faculty."

10a.   Plaintiff and other faculty complained about these policies and Dean Steadman had knowledge of his complaint by at least the time of an ECE Department meeting in early 2007/2008 via the minutes of this meeting.

10b.   The ratio of applicants for ECE positions was three-to-one (or more) in favor of non-native applicants until Dean Steadman instituted two restrictions in the ECE Search Committee (SC).

10c.   In April 2008, he directed the SC not to interview applicants who held an H1B visa (temporary professional work visa). Dean Steadman initially claimed that this was a College of Engineering policy. He reversed this policy in about September 2008.

10d.   In  November 2008 he instructed the SC to include in its Short (Interview) List only permanent (green-card) residents and US citizens. Dean Steadman stated that this policy had been cleared by the university's attorney and the vice-president of academic affairs. However, he ultimately abandoned this policy.        -3-

10d.   In the interim between the two policies, plaintiff raised the issue at an ECE Department meeting whether qualified H1B visa candidates had been excluded. The then chairman of the SC, Sam Russ, agreed that such candidates had been excluded, but assured plaintiff that the best candidates had been selected. The minutes of this meeting reported this question and they went to Dean Steadman.

11.   In the Fall 2008, after this meeting plaintiff requested leave of one semester to have five-six dental surgeries done overseas at a cost he could afford. In a series of three meetings, the second with the university attorney, Dean Steadman, after consulting with HR and a dentist, limited plaintiff to six weeks with five days of sick leave and two days of unpaid leave between each surgery with a start date of August 29, 2008 and a return to work date of October 21. On October 20, his office called the ECE office to determine if he had returned to work.

12.   Plaintiff had also spent the two weeks before his leave date in two meetings about the surgeries other than those with Steadman and satisfying the Dean's paper work requirements with overseas doctors.

13.   Further, as a consequence of having to be out for much of the semester, his teaching load had been assumed by others so that plaintiff could only advise students, supervise graduate student theses, write research proposals for funding, etc.

14.    However, at the end of the academic year in May 2009, Alam, on the written instructions of the Dean, proposed to evaluate him for the full year as though he had been teaching the first semester and on the other work he had done. Moreover, he refused to give him any consideration for recovering from the surgeries. Such an evaluation resulted in a lower score and jeopardized plaintiff's raises and promotions. He refused to sign the evaluation.

15.    In July 2008 Dr. M. Alkhatib began a process of resigning and withdrawing his resignation and ultimately filed an EEOC charge. In the Fall of 2009 plaintiff gave a statement to the EEOC in which he accused Dean Steadman of racism based on the statements in para. 10.

16.    Dean Steadman had knowledge of plaintiff's statement.

17.    In February 2010 plaintiff was a nominee in the College of Engineering for the annual Excellence in Research Award.

18.    After the time for nominations had closed, but before the time for announcing the winner, he went to Dr Parker, the ECE representative on the Award Committee, to ask about the number of nominees for the Award (and to confirm what he had been told previously, i.e., that he was the only nominee for this award). However, Dr Parker, citing Dean Steadman's instructions, refused to discuss it.

19.   At an ECE Department meeting on April 13, 2010, plaintiff asked Chairman Alam about the outcome of the Excellence in Research Award.   Alam deferred to Dr Parker who declined to answer.

20.   At a meeting on April 23, 2010 called by Dean Steadman, attended by Chairman Alam, he learned from Dean Steadman that the award was cancelled. Plaintiff ultimately complained to Steadman that he had cancelled it because "I am the only candidate and because you are taking revenge of me." (sic)

21.   Steadman became very angry and ended the meeting.

22.   Afterwards, Dean Steadman and Chairman Alam remained in the meeting room.  Dr Steadman stated, "I'll make it so tough on him he'll have to resign."

23.   In the Fall 2010 semester, plaintiff complained about this statement and the cancellation of the Award to Lea Russ, the Vice-President for Research, and to Jean Tucker, the attorney for the University.  Plaintiff so advised his Chairman.

24.   Dean Steadman had knowledge of one or both of these complaints.

25.   In October 2010, plaintiff's wife was diagnosed with cancer.

26.   During the academic year 2010-2011, Dr S. Alsharif (a naturalized citizen) and Sam Russ (native born) applied for tenure and promotion.

27.   At the ECE Department level Alsharif was originally approved for tenure 7-0. Sam Russ, a native born American, was approved 6-1.

28. However, the T&P Chair, Dr Rahman, e-mailed all ECE T&P Committee members that Dr Parker wanted to change his vote.

29. The next day the tenure vote for Alsharif was re-done and it was 5-1 in favor. Dr Parker voted to deny tenure.

30. Plaintiff was the only one to abstain. He did so because he thought it was illegal to change the vote and because he thought that Dr Parker was supporting Dean Steadman's plan to change the demography of the ECE Department. He conveyed this thinking to his Department Chair, Dr Alam, and to the T&P Chair, Dr Rahman.

31. A week later Dr Alsharif and Sam Russ were approved for promotion by the ECE Committee.

32. The matter then went to the College T&P Committee. Four members are selected by the four Departments for two years and three are traditionally selected before the Departments vote by the Dean. Dr Rahman was the previously selected ECE Department representative. Dr Parker was appointed by the Dean after he changed his vote and all three were appointed by the Dean after the Department vote.

33. As to Alsharif the College vote on tenure was 3-4 against and was also against promotion.

34. However, Sam Russ was approved for both tenure and promotion. This matter was concluded by May 2010.

35. Alsharif then filed an EEOC charge in the Fall of 2010, alleging that he was as well qualified or better than Russ.

36. In 2011 plaintiff gave the EEOC a statement in Alsahrif's case that Dean Steadman was a racist based on his implementing the above three statements. (para. 10) Alsharif eventually filed a federal complaint.

37. Plaintiff alleges that Dean Steadman knew of plaintiff's 2011 statement in Alsharif's case.

38. In the Fall 2011 semester plaintiff asked for a teaching load reduction from three to two courses and from five to four days because of his wife's chemotherapy for cancer on Fridays. The Dean granted it with a 20% pay reduction by charging plaintiff's accumulated FMLA.

39. Plaintiff had his first heart attack, November 8, 2011; he was not as vocal in his criticism of the Dean; Alsharif's lawsuit proceeded.

40. At the end of the 2011-12 academic year (May 2012) plaintiff requested a one-year unpaid medical leave to be effective August 2012 (Fall 2012) to run through May 2013 (Spring 2013) until August 2013. The purpose of the leave was to continue to care for his wife and also for himself after his first heart attack.

41. The Chairman approved it in the absence of the Dean.                    -8-

42. The Dean complained that the Chairman had granted it without his input.

43. Alsharif settled his lawsuit at about the same time Alam granted plaintiff his leave, i.e., May 2012.

44. For 2012-2013 plaintiff left USA on leave without pay, did not return to work, and had no further interaction with Dean Steadman until August 2013, when he was terminated.

## Count 1 -Retaliatory termination

45. While still on leave for 2012-2013, plaintiff had a massive heart attack in July 2013 while visiting family overseas in Dubai such that he requested an extension of leave without pay for the next academic year from August 2013 through May 2014.

46. Both his prior doctor in the US and his local doctor in Dubai advised against returning, but to instead get immediate local treatment.

47. After an angiogram in Dubai on July 13, 2013 the first treatment opinion was for open-heart surgery. He contacted his cardiologist in Mobile who had inserted two stents in November 2011. That doctor advised that non-invasive stents might work, forbade airplane travel, and to rely on local (Dubai) advice.

48. Accordingly, plaintiff obtained a second-opinion of a highly qualified Dubai cardiologist and decided to undergo non-invasive stent procedures followed by

-9-

three mandatory examinations in Dubai on September 2, 2013; November 11, 2013; and in the last week of December 2013.

49.     The stent procedures were performed July 17, 2013. Plaintiff had six stents inserted in two surgeries.  Three stents were to dissolve over the course of the next 18 months, but plaintiff had to be monitored in the three appointments (above) to check whether they were functioning as intended or open heart surgery was unavoidable.

50.     Because plaintiff might not have been able to return for the fall semester of the school year 2013-14, he notified Chairman Alam on July 22, 2013 as soon as he recovered from the stent procedures.

51.     Alam asked him to submit a form to extend his existing medical leave. Plaintiff did so on July 22, 2013.  Plaintiff first asked for two semesters (August 15, 2013 to May 15, 2014).  (Later he reduced the extension to one semester.)

52.     Chairman Alam orally approved plaintiff's request for one year the next day and forwarded it to Dean Steadman who did not reply until August 1(Thursday) when he objected.  The Dean required an answer in 24 hours whether plaintiff would be on campus August 15, the beginning of the school year.  Plaintiff replied that Friday was a national Dubai holiday and that he would not be able to advise until Monday (August 5) after he consulted his local doctor.

53.    This exchange between the Dean and plaintiff was plaintiff's first communication since May 2012, more than a year earlier.

54.    On August 2, 2013 plaintiff offered to return for the second semester, pending medical advice.

55.    On August 2, 2013, the Dean replied that he would be away from August 3 to August 13, so plaintiff would have to communicate with someone else; he did not identify anyone.  Plaintiff assumed that this person was David Johnson, the Vice-President for Academic Affairs.

56.    On August 5 plaintiff advised the Dean, with a copy to Johnson, Alam, and James Laier, that he needed to keep his three appointments in Dubai and to be closely monitored in between.  He could not return for August 15, but would available shortly after his second appointment on November 11, 2013.

57.    On August 6 (Tuesday), Dr Johnson, writing obo Dr Steadman, advised that defendant could not grant his request for one year leave.  He required a letter by August 12 (Monday) from plaintiff's doctor that he could return to work on January 2, 2014 in order that they might consider granting plaintiff's revised extension request for the Fall semester only.

58.    On August 7, plaintiff advised Dr Johnson and the others that his local Dubai doctor was on another national holiday and would return on Monday (August 12).                                                      -11-

59.    On August 12, the first working day after the holiday, plaintiff requested a medical certificate letter in accordance with Dr Johnson's instructions.  He was advised that it would not be ready until the next day.  The certificate  was ready on August 13, sent that date Dubai time, and received in Mobile on August 12.  It advised that he was fit to resume his duties by January 2, 2014. It was sent to Dr Johnson, with copies to Dr Steadman, Dr Alam, and Dr Laier.  Plaintiff noted that a confirming letter with more details about the surgeries and required follow up appointments would follow within 48 hours.

60.    Two days later (August 15, Dubai time) plaintiff acquired the letter and e-mailed it to Dr Johnson, with copies as above.  It was received in Mobile on August 14.

61.    Five days later, on August 20 Dean Steadman e-mailed plaintiff that the summary of the *second* letter stated plaintiff was fit for duty as of the present and was under no travel restrictions, so that a leave of an entire semester "appears unnecessary and would not be considered reasonable."  Because it was now past the reporting date of August 15, he considered that plaintiff had resigned and was therefore terminated.  (This letter was possibly written after consultation with a USA attorney.)

62.    Dean Steadman terminated plaintiff notwithstanding the *first* letter of August

-12-

13, which he did not mention, and notwithstanding that he apparently could have notified plaintiff on August 14, more than a week before the first teaching day, August 22, of the import of the second communication and warned him of the consequences of failing to report on August 15. At the least he could have advised plaintiff that the second letter was confusing or contradictory. Instead, he waited five days *past* the reporting date of August 15 to say anything - at which point it was too late.

63.	Upon learning this news, plaintiff on August 26 requested an appointment in Alabama with the Dean after his first check up in order to appeal his termination. It was eventually set for about September 18, 2013. Exhausted and feeling chest pain when he arrived, plaintiff had a complete heart check up.

64.	During the meeting plaintiff explained that the doctor who wrote the second letter had not know that plaintiff would be working in America. Three days later the Dean advised that the appeal was denied.

65.	Plaintiff alleges that his termination was in retaliation for his on going complaints that Dr Steadman was a racist.

66. There were at least six of these protected complaints followed by
"retaliation":

* In 2006 a complaint about racially discriminatory salary raises (para. 8)

  *followed* by Steadman's complaint to plainitiff's chairman about his allowing a department member to accuse him of racism (para. 9);

* complaints about hiring discrimination in 2007 and 2008 (para.10a)

  *followed* by problems with his dental leave (para.11);

* his making statements to the EEOC in 2009 in the case of Alkhatib; (para. 15)

  *followed* by Steadman's cancellation of the Excellence in Research Award (paras. 17-21);

* complaints of retaliation by Steadman's apparent cancellation of the Excellence in Research Award in April 2010 (para. 20)

  *followed* by Steadman's "so tough" remark (para. 22);

  and

* his making statements to the EEOC in 2011 in the discrimination case of Alsharif that were similar to the ones he made in Alkhatib's case in 2009 (para. 36)

  *followed* by a 20% salary reduction for 2011-12 chargeable to plaintiff's FMLA (para. 38) and discharge in August 2013.

## **Count II - Termination by resignation because of national origin**

67. Dean Steadman has a long history of national origin animus with respect to hiring, plaintiff's salary raises, promotion/tenure (termination), and termination by way of resignation of faculty members.

68. As to hiring, Dean Steadman steadily pushed for hiring native-born professors for announced vacancies, e.g., para.10, *supra*, and by other means identified below. When Dean Steadman was hired the ratio in the ECE Department was10-1 non-native to native born; by 2012 it was 8 to 3.

69. The ratio of applicants for ECE positions was three-to-one (or more) in favor of non-native applicants until Dean Steadman instituted two restrictions in the ECE Search Committee (SC) in 2008. See paras. 10b to 10d.

70. On the occasions when plaintiff has served on the ECE Search Committee (mid 2008-mid 2010) under Peter Byrne, he is aware of Dean Steadman's intervening on behalf of two native-born applicants, but never obo a native born. They were Tim Brothers and one was a local applicant whom plaintiff cannot now recall.

71. Further, on probably two occasions the Short List was comprised solely of non-native born. Further, it was always dominated by non-native applicants because of the high ratio of non-native applicants to native applicants. Finally, the Short List was never composed entirely of native-born applicants.      -15-

72.     In 2006-08 the ECE SC produced ranked Short Lists of candidates for Dean Steadman.

73.     However, by late 2008, Dean Steadman directed that the ECE SC Short List be forwarded to him without ranking.

74.     While non-natives were hired, they were hired as second choices or when vacancies unexpectedly became available.   That is, when there were native born applicants, offers (possibly verbal) would be made first to them, and if they declined, then to the non-native born.

75.     For example, Tim Brothers and FNU Baylis declined offers after which the positions for which they applied were filled by non-native born applicants.

76.     The case of Brothers occurred in 2009-2010.  Brothers made it to the Short List, was called for an interview, and possibly was given a verbal offer.   However, he told the SC he was going elsewhere.

77.     As the SC began to deliberate to whom it should next make an offer, Dean Steadman instructed the SC not to drop his name because he intended to try to get Brothers to change his mind, this notwithstanding a less than favorable student evaluation.  A few days later, Steadman advised that he had failed to persuade him.

78.     As to discrimination with respect to plaintiffs' salary raises, he and Tom Thomas, the only native-born ECE faculty member when Dean Steadman arrived,

-16-

were hired at about the same time, paid about the same, were of the same rank, and at least equal in performance. However, Steadman gave Thomas three consecutive raises larger than the ones he gave plaintiff. By 2009, Thomas' salary was $93,000 and plaintiff's $76, 600/yr.

79. As to promotion/tenure (termination) issues, plaintiff adopts paras. 26-37 concerning Dr Alsharif and Sam Russ.

80. Resignations have been treated differently.

81. Dean Steadman treated plaintiff's purported resignation differently from that of a native born American - Mark Adam who was a tenure-track assistant professor who replaced a non-native professor who resigned. He got an offer from elsewhere and submitted his resignation in 2010-11. Before the ECE Department started looking for a replacement, Steadman intervened by stating that he would give Adams some incentive package to try to keep him. Adams later told the Department that he rejected the offer and he left.

82. Adams' case contrasts with the way he handled two resignation cases of non-natives, plaintiff and Dr Alkhatib, No. 10-00343-KD-C, SDAL, SDIV. Both plaintiff and Dr Alkhatib were non- native, tenured and promoted faculty members.

83. In Dr Alkhatib's case, he attempted to withdraw his resignation in July 2008, but Dr Steadman claimed that the deadline to withdraw his resignation had passed

.    -17-

by one day and, in e-mails, that defendant's resources had been allocated to another faculty candidate. In fact, the offer letter to Dr Alkhatib's replacement was not mailed until six days after the effective date of the resignation.

84. In plaintiff's case, Dean Steadman upheld the purported resignation based on the doctor's opinion that he was fit to resume his normal work and on his (Steadman's) interpretation that he could return to work as of August 15. He made and persisted in this interpretations despite several explanations from plaintiff prior to August 15 that it was not practical for him to "commute" between his first Dubai appointment in September and his second Dubai appointment in November85.

He waited five days until August 20 to advise that he considered plaintiff to have resigned as of August 15 and classes did not begin until August 22.

86. Steadman construed plaintiff's failure to appear on August 15 as a resignation despite clear correspondence that January 2, 2014 was the target date.

87. The reason for terminating plaintiff and denying his appeal - that he had resigned - was pretextual.

88. It was also motivated by Steadman's national origin discrimination as shown

by:
* His "demographic" remarks (para.10)

* His HIB policy and related policies (para. 10b - 10d)

* His other hiring policies (intervention re Brothers, et al and unranked short list ( paras. 70-77)

* His discriminatory pay raises to Thomas as compared to plaintiff (para. 78)

* His intervention in the T&P process with respect to AlSharif and Russ (paras. 26-34) and

* His different treatment of the Adams' resignation compared to that of Alkhatib and plaintiff. (paras. 81-86)

## Count 3- Failure to accommodate under Sec 504 of the Rehabilitation Act of 1973

89. The University of South Alabama receives federal funding such that it is covered entity under the Rehabilitation Act.

90. Plaintiff was an individual qualified to perform the essential functions of his position as a professor in the ECE Department.

91. He was disabled within the meaning of the Rehabilitation Act in that he was substantially impaired in his ability to perform the major life activity of working in August 2013.

92.   The failures of the University of South Alabama to accommodate plaintiff first in August and then in September 2013 with medical leave of another semester (or at least until November 15) and termination were unreasonable.

93.   Plaintiff alleges that the reason - resignation- for terminating him was pretextual.

94.   All matters of each count are re-alleged under succeeding counts as though pled therein.

## Relief sought

95.   Plaintiff seeks back pay (less interim earnings) and reinstatement or front pay for an appropriate period.  In either case he seeks pay at a non-discriminatory rate.  He also seeks liquidated and/or compensatory damages as appropriate, attorney fees, costs, and a bench trial.

Respectfully submitted,

Aed El-Saba
PO Bx 8073
Mobile, AL 36689
1665 Ashmoore East
Mobile, AL 36695
(T) 251/366-5000

PLEASE HOLD SERVICE
NOTICE AND WAIVER WILL BE USED