## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **AED EL-SABA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 15-00087-KD-N** |
| | ) | |
| **UNIVERSITY OF SOUTH ALABAMA,** | ) | |
| **Defendant.** | ) | |

### REPORT AND RECOMMENDATION

This action is before the Court on the Motion to Dismiss (Doc. 11) and supporting brief (Doc. 12) filed by Defendant University of South Alabama ("the University"), which seeks dismissal of the Complaint (Doc. 1) under Federal Rule of Civil Procedure 12(b)(6).  Plaintiff Aed El-Saba ("El-Saba") has timely filed a response (Doc. 21) to the motion, and the University has timely filed a reply (Doc. 23) to the response.  The motion is now under submission (*see* Doc. 20) and is ripe for disposition.

Under S.D. Ala. GenLR 72(b), the Motion to Dismiss (Doc. 11) has been referred to the undersigned Magistrate Judge for entry of a report and recommendation as to the appropriate disposition, in accordance with 28 U.S.C. § 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b)(1), and S.D. Ala. GenLR 72(a)(2)(S).  Upon consideration, and for the reasons stated herein, the undersigned **RECOMMENDS** that the University's Motion to Dismiss (Doc. 11) be **GRANTED in part** and **DENIED in part**, as set out.

## I.    __Well-Pleaded Factual Allegations__[1]

El-Saba, whose country of origin is Lebanon, became a naturalized United States citizen in 1991.  El-Saba was employed at the University as a professor in its Electrical and Computer Engineering ("ECE") Department.[2]   His immediate supervisor was M.S. Alam, Ph.D. ("Chairman Alam"), chairman of the ECE Department.  At all relevant times, John Steadman, Ph.D. ("Dean Steadman"), was dean of the University's College of Engineering.

El-Saba's Complaint documents a litany of instances of perceived discrimination against foreign-born/middle eastern professors, perpetrated against both himself and others, dating back to "the end of the 2006 academic year…" These actions of discrimination were perpetrated primarily by Dean Steadman, with various other University employees also participating at different times.  The following timeline summarizes these alleged instances of discrimination:

1. End of the 2006 academic year – El-Saba accuses Dean Steadman of racial discrimination against Middle Eastern professors with respect to salary raises for 2004-2006 at a general meeting of approximately 25 professors.

---

[1] In deciding a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted," the Court construes the complaint in the light most favorable to the plaintiff, "accepting all well-pleaded facts that are alleged therein to be true." *Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir. 2013) (citing *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1328 (11th Cir. 2006)).   However, " 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.' " *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[2] El-Saba's Complaint never actually specifies in what capacity he was employed.  However, the University identifies him as having been a professor in its briefing, and the Complaint's allegations indicate this is the case.

Dean Steadman was asked to recuse himself at this meeting.  The following day, Dean Steadman asked Chairman Alam how he could allow El-Saba to accuse him of racism.

2. Late 2006/early 2007 – Dean Steadman states that he wanted to "change the demographics" of the ECE Department.

3. 2007/early 2008 – Dean Steadman says that he would like to hire native born, natural English speaking faculty.  El-Saba and other faculty complained of this policy at an ECE department meeting, which is allegedly reflected in the minutes of this meeting.[3]

4. April 2008 – Dean Steadman directs the ECE Department's Search Committee not to interview applicants holding H1B visas (temporary professional work visas), initially claiming this was a College of Engineering policy.  At a department meeting, as reflected in the meeting minutes, El-Saba raised the issue of whether qualified candidates were being excluded under the H1B visa policy.  The chairman of the search committee agreed they had but assured El-Saba that the best candidates had been selected. Dean Steadman reversed the H1B visa policy in September 2008.

5. Fall 2008 - El-Saba requests one semester of leave to have dental surgery done overseas.  In a series of three meetings, Dean Steadman limited El-Saba to six weeks with five days of sick leave and two days of unpaid leave

---

[3] El-Saba alleges that Dean Steadman receives a copy of all ECE Department minute meetings and would therefore be on notice of El-Saba's various complaints raised at these meetings through the minutes.

between each surgery with a start date of August 29, 2008, and a return to work date of October 21.

6. November 2008 – Dean Steadman instructs the search committee to include only permanent resident applicants (i.e. those with "green cards") on its short interview list, claiming this instruction had been cleared by the University's attorney and the Vice President for Academic Affairs. This policy was ultimately abandoned.[4]

7. Late 2008 – Dean Steadman, through Chairman Alam, tells the search committee that he "would prefer, all things being equal, to hire native born, natural English speaking faculty."

8. May 2009 – Chairman Alam, on written instructions from Dean Steadman, proposed to evaluate El-Saba for the full 2008-2009 academic year without giving regard to the fact that El-Saba was on leave during the Fall 2008 semester for dental surgery, *see supra*. This, according to El-Saba, would have failed to account for the fact that, while he was out during the Fall 2008 semester, his teaching load had been assumed by others and El-Saba could only "advise students, supervise graduate student theses, write research proposals for funding, etc." Chairman Alam also "refused to give him any consideration for recovering from the surgeries." This evaluation resulted in

---

[4] El-Saba claims that, before Dean Steadman instituted the H1B visa policy and the permanent-residents-only policy, the "ratio of applicants for ECE positions was three-to-one (or more) in favor of non-native applicants…" El-Saba does not indicate what the ratio changed to after instituting these policies or whether their alleged "abandonment" reset the status quo. He also claims that when Dean Steadman was hired, the ratio of faculty in the ECE Department was 10-1 in favor of non-native-born professors; by 2012, it was 8 to 3.

a lower score and jeopardized El-Saba's raises and promotions.   El-Saba refused to sign the evaluation.

9. Fall 2009 – El-Saba gives a statement to the Equal Employment Opportunity Commission in regards to an EEOC charge of racism by Dean Steadman filed by another ECE Department professor, Dr. Alkhatib.

10. 2009 – El-Saba and Tom Thomas, "the only native-born ECE faculty member when Dean Steadman arrived, were hired at about the same time, paid about the same, were of the same rank, and at least equal in performance." Nevertheless, Dean Steadman gave Thomas three consecutive raises larger that ones given El-Saba.  By 2009, Thomas's yearly salary was $93,000, while El-Saba's was $76,600.

11. February 2010 – El-Saba was nominated for the College of Engineering's annual Excellence in Research Award.  After nominations were closed, El-Saba attempted to verify with a member of the award committee that he was the only nominee for the award (which he claims "he had been previously told" by unidentified sources).   The committee member, citing Dean Steadman's instructions, refused to discuss the matter.

12. April 23, 2010 – Dean Steadman announced at a meeting that the Excellence in Research Award was cancelled.   El-Saba accused Dean Steadman of canceling the award because El-Saba was the only candidate and because Dean Steadman was trying to "take revenge" on him.   Dean Steadman became angry and ended the meeting.   Afterward, Dean Steadman and

Chairman Alam remain in the room, with Dean Steadman telling Chairman Alam, "I'll make it so tough on him he'll have to resign."

13. Fall 2010 – El-Saba complains about Dean Steadman's award cancelation and statement to Chairman Alam at the April 23, 2010 meeting to the Vice-President for Rearch and the University attorney. El-Saba advised Chairman Alam that he had done so.

14. 2010-2011 academic year – ECE Department faculty Dr. S. Alsharif, a naturalized citizen, and Sam Russ, a native-born American, applied for tenure and promotion. At the Department level, Alsharif was originally approved for tenure on a vote of 7-0, and Russ a vote of 6-1. However, Dr. Parker, another ECE faculty member, subsequently changed his vote in favor of tenure for Alsharif. El-Saba abstained from the new vote on Alsharif, thus resulting in a new vote of 5 – 1 in favor of Alsharif. El-Saba informed Chairman Alam and the chair of the College of Engineering's tenure and promotion (T&P) committee that he had abstained because he believed it was "illegal" to change the vote and because he believed Dr. Parker was supporting Dean Steadman's plan to change the demographics of the ECE Department. After Alsharif and Russ were both approved for promotion by the ECE Department, the matter went to the T&P committee, which consists of seven members, with three traditionally being selected by the Dean before the departments vote on tenure and promotion. Dr. Parker was appointed to the T&P committee by Dean Steadman after he changed his vote, and all

three of Dean Steadman's selections to the T&P committee were after the ECE Department vote.  Alsharif was denied tenure on a 3-4 vote by the T&P committee and was also denied promotion, while Russ was approved for both.

15. Mid-2008 – mid-2010 – During the time El-Saba serves on the ECE Department's Search Committee, Dean Steadman intervenes on behalf of two native-born applicants (Tim Brothers and an unnamed "local applicant") but "never obo a native born" (given the context of this allegation (*see* Doc. 1 at 15, ¶ 70), the undersigned presumes El-Saba meant to write "never obo a non-native born").  In 2006-08, the Search Committee ranked the "Short Lists" of candidates for Dean Steadman.  However, by late 2008, Dean Steadman directed the Committee to forward him "Short Lists" without ranking.  Non-natives were hired as second choices or when vacancies unexpectedly became available.  Offers would first go to native-born applicants, and then to non-native applicants if the native applicant declined. For instance, after Tim Brothers and applicant Baylis both declined offers, their positions were filled by non-native applicants.  In Brothers's case, occurring in 2009-10, Brothers was called for an interview[5] but told the Search Committee he was going elsewhere.  When the Search Committee began considering the next applicant to make the offer to, Dean Steadman instructed the Committee not to drop Brothers's name because he was going to try to change his mind, "this notwithstanding a less than favorable student

---

[5] El-Saba also alleges that Brothers "possibly was given a verbal offer."   Speculation is not accepted as fact.

evaluation." Dean Steadman later advised that he had failed to persuade Brothers to change his mind.

16. Fall 2010 – Alsharif files an EEOC charge alleging discrimination in the selection of Russ over himself. In 2011, El-Saba provides the EEOC a statement as to Alsharif's charge asserting that Dean Steadman was a racist due to his statements about changing the demographics of the ECE Department.

17. Fall 2011 – El-Saba asked for a teaching load reduction from three to two courses, and from five to four days, due to El-Saba's wife's chemotherapy treatments on Fridays. Dean Steadman granted the reduction with a 20% pay reduction by charging El-Saba's "accumulated FMLA."

In May 2012, El-Saba requested a one-year unpaid medical leave, from August 2012 through August 2013, for the purpose of caring for his wife and for himself after he experienced a heart attack in November 2011.[6] In July 2013, while still on unpaid medical leave, El-Saba experienced another, "massive heart attack" while visiting family in Dubai. Both his previous doctor in the United States and his Dubai doctor advised him against returning to the United States and to instead seek immediate treatment locally. After undergoing stent surgery, El-Saba contacted Chairman Alam on July 22, 2013, requesting an extension of unpaid leave for two additional semesters, through May 2014. At Chairman Alama's request, that same day El-Saba submitted a form requesting extension of his medical leave.

---

[6] Chairman Alam approved the leave "in the absence of" Dean Steadman, which Dean Steadman complained about to Chairman Alam for "grant[ing] it without his input."

The following day, Chairman Alam orally approved the request for an extra year of leave and forwarded the request to Dean Steadman, who responded with an objection on August 1, 2013.

Dean Steadman demanded that El-Saba inform him within 24 hours whether he would be on campus August 15, 2013, the beginning of the school year.  El-Saba advised Dean Steadman that, because of a national holiday in Dubai, he would be unable to answer until August 5, after he could consult his local doctor.  On August 2, El-Saba offered to return the second semester of the 2013-2014 school year, pending medical advice.  Dean Steadman responded that he would be away from August 3 through August 13 and that El-Saba would have to communicate with someone else.  Dean Steadman did not identify with whom he wanted El-Saba to communicate in his absence; El-Saba assumed he was to contact Dr. David Johnson, Senior Vice-President for Academic Affairs ("Vice President Johnson").

On August 5, El-Saba informed Dean Steadman, Vice-President Johnson, and Chairman Alam that "he needed to keep his three apointments in Dubai and to be closely monitored in between" and would not be able to return August 15, though he would be available "shortly after his second appointment on November 11, 2013." On August 6, Vice President Johnson, writing on behalf of Dean Steadman, advised El-Saba that his request for one-year extended leave would not be granted.  Vice President Johnson required El-Saba to submit, no later than August 12, a letter from his doctor stating that he could return to work on January 2, 2014, in order for El-Saba's alternative request for one-semester's extended leave to be considered.

El-Saba requested a medical certification letter from his doctor on August 12 (Dubai time, and the first working day after the holiday) and was advised that it would not be ready until the next day.  The certificate advising that El-Saba was fit to resume his duties by January 2, 2014, was received by El-Saba and sent to Vice President Johnson, Dean Steadman, and Chairman Alam on August 13 (Dubai time) so that it was received by them on August 12 (U.S. time).  El-Saba also informed them that a confirming letter with more details about his surgeries and required follow-up appointments would follow with 48 hours.  This confirming letter was sent August 15 (Dubai time), so that it was received by the University officials August 14 (U.S. time).

On August 20, Dean Steadman emailed El-Saba that "the summary of the *second* letter stated [El-Saba] was fit for duty as of the present and was under no travel restrictions, so that a leave of an entire semester 'appears unnecessary and would not be considered reasonable.' Because it was now past the reporting date of August 15, he considered that [El-Saba] had resigned and was therefore terminated." (¶ 61).  On August 26, El-Saba requested an appointment with Dean Steadman in Alabama after his first check-up in order to appeal the termination. The meeting was set for on or about September 18, 2013.  There, El-Saba explained that the doctor who wrote the second letter had not known El-Saba would be working in America.  Three days later, Dean Steadman advised that the appeal was denied.

## II.      Causes of Action

El-Saba initiated this civil action on February 18, 2015, by filing a Complaint

(Doc. 1) with the Court alleging three causes of action against the University:[7]

Count 1 – Retaliatory termination in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of

1991, 42 U.S.C. § 1981a ("Title VII")

Count 2 – Disparate treatment (termination) on the basis of national origin

in violation of Title VII.[8]

---

[7] Generally, a "document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation and quotations omitted).  El-Saba filed his Complaint *pro se*.  However, approximately two months later, on April 7, 2015, El-Saba's current counsel filed for permission to appear *pro hac vice* (Doc. 2), which was granted on April 30 (*see* Doc. 7).  Counsel thereafter sent a waiver of service to the University, which executed the waiver on May 15 (*see* Doc. 9-1). The University filed its motion to dismiss approximately two months later, on July 8.  (Doc. 11).  Current counsel has had ample opportunity to file an amended complaint as a matter of course on El-Saba's behalf, up to within 21 days of the filing of the present motion to dismiss.  *See* Fed. R. Civ. P. 15(a)(1)(B).  Counsel has not done so and has instead defended the sufficiency of the Complaint (or, at least, Counts 1 and 2) in response to the University's motion to dismiss, indicating it is counsel's professional judgment that the Complaint is adequately drafted as-is.  Moreover, El-Saba has not argued in his counseled response brief that his Complaint is entitled to the liberal construction afforded *pro se* litigants.  Thus, the undersigned finds that the "less stringent" standard normally afforded *pro se* litigants should not be applied to El-Saba's Complaint.

[8] El-Saba's Complaint, as well as both parties in their briefing on the motion to dismiss, have characterized El-Saba's termination as a "termination by resignation."  Regardless of how Dean Steadman may have chosen to characterize El-Saba's failure to report to work August 15, 2013, the factual allegations in the Complaint show that the adverse employment action at issue is, in substance, a termination, not a resignation.  To the extent El-Saba is attempting to assert a claim for "constructive discharge" in either Count 1 or Count 2, such a claim is neither specifically alleged nor factually supported in the Complaint.  *See Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003) ("A constructive discharge occurs when a discriminatory employer imposes working conditions that are so intolerable that a reasonable person in the employee's position would have been compelled to resign." (quotation omitted)); *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (per curiam) (noting that "[t]he threshold for establishing

**Count 3** – Failure to accommodate in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701.

## III.   Legal Standards

> To withstand Rule 12(b)(6) scrutiny and satisfy Rule 8(a), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," so as to "nudge[ ][its] claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U .S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citation omitted). "This necessarily requires that a plaintiff include factual allegations for each essential element of his or her claim." *GeorgiaCarry.Org, Inc. v. Georgia,* 687 F.3d 1244, 1254 (11th Cir. 2012). Thus, minimum pleading standards "require [ ] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. As the Eleventh Circuit has explained, *Twombly/Iqbal* principles require that a complaint's allegations be "enough to raise a right to relief above the speculative level." *Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention,* 623 F.3d 1371, 1380 (11th Cir. 2010) (citations omitted). "To survive a 12(b)(6) motion to dismiss, the complaint does not need detailed factual allegations, ... but must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Randall v. Scott,* 610 F.3d 701, 705 (11th Cir. 2010) (citations and internal quotation marks omitted).

*Cochran v. Southern Co.*, Civil Action No. 14-0569-WS-N, 2015 WL 3508018, at *1 (S.D. Ala. June 3, 2015). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and quotations omitted).

---

constructive discharge … is quite high" and "higher than the standard for proving a hostile work environment").

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (citations omitted). "Importantly, … courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n*, 605 F.3d at 1290 (quoting *Iqbal*, 556 U.S. at 682).

Finally, the Court looks to the pleading as a whole in determining whether the "plausibility standard" has been satisfied. *See Speaker*, 623 F.3d at 1382 ("Reading Speaker's Amended Complaint as a whole, we conclude that it both alleges the requisite statutory elements and marshals 'enough facts to state a claim to relief that is plausible on its face.' *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974."); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1252 n.11 (11th Cir. 2005) (per curiam) (stating that, in a Rule 12(b)(6) context, "[w]e read the complaint as a whole"). The First Circuit Court of Appeals has elaborated on this principle, holding:

> The question confronting a court on a motion to dismiss is whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible. *See* [*Twombly*, 550 U.S.] at 569 n.14, 127 S. Ct. 1955; *Braden v. Wal–Mart*

*Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (explaining that "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible"). No single allegation need "lead to the conclusion"—in the district court's words—of some necessary element, provided that, in sum, the allegations of the complaint make the claim as a whole at least plausible. *See Sepúlveda–Villarini*[*v. Dep't of Educ. of Puerto Rico*], 628 F.3d [25], 29[ (1st Cir. 2010)] ("The make-or-break standard ... is that the *combined* allegations, taken as true, must state a plausible, not a merely conceivable, case for relief."[ (citing *Twombly* and *Iqbal*)]) (emphasis added). Indeed, the Supreme Court has suggested that allegations that would individually lack the heft to make a claim plausible may suffice to state a claim in the context of the complaint's other factual allegations. *See Twombly,* 550 U.S. at 557, 127 S. Ct. 1955 ("An allegation of parallel conduct ... gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility.").

*Ocasio-Hernandez v. Fortuno-Burset,* 640 F.3d 1, 14-15 (1st Cir. 2011).  *Accord, e.g.,* *Garcia-Catalan v. United States,* 734 F.3d 100, 103 (1st Cir. 2013) ("We emphasize that the complaint must be read as a whole.  As we have explained, there need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action.  For pleading purposes, circumstantial evidence often suffices to clarify a protean issue." (citations and quotations omitted)); *Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto Rico,* 743 F.3d 278, 283 (1st Cir. 2014) ("We have also recently cautioned that some courts apply the plausibility standard 'too mechanically' and fail to read complaints 'as a whole.' " (quoting *García–Catalán,* 734 F.3d at 101, 103)).[9]

_____

[9] The University has attached two exhibits to its motion to dismiss, consisting of (1) an email from El-Saba to Dean Steadman dated August 5, 2015, and (2) the second letter from El-Saba's Dubai physician that was sent to the University on August 14, 2013.  (Docs. 12-1 and 12-2).  Not to be outdone, El-Saba has attached thirteen exhibits to his response, consisting of various additional emails relating to El-Saba's attempt to extend his medical leave in August 2013 and his subsequent termination.  (Doc. 21-1).  A court may, in certain

# IV.   Analysis

## A.   *Failure to Accommodate under Rehabilitation Act (Count 3)*

"The Rehabilitation Act prohibits recipients of federal financial assistance from discriminating against individuals with disabilities." *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1310 (11th Cir. 2007) (citing *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998)).   To establish a *prima facie* case of discrimination under the Rehabilitation Act, El-Saba must show that (1) he had a disability; (2) he was otherwise qualified for the position; and (3) he was subjected to unlawful discrimination as the result of his disability.   *Id.*   El-Saba accuses the University of violating the Rehabilitation Act by failing "to accommodate [him] first in August and then in September 2013 with medical leave of another semester (or at least until November 15)" and for terminating him.   (Doc. 1 at 20, ¶ 92).

The University argues in its initial brief that Count 3 should be dismissed because El-Saba has not alleged facts plausibly suggesting that he is disabled for purposes of the Rehabilitation Act.   In response, El-Saba expressly states that he "abandons Count III – Failure to accommodate."   (Doc. 21 at 1 n.1).   In reply, the University urges the Court to dismiss Count 3 with prejudice as abandoned.

Previously, Chief Judge Steele, after conducting an exhaustive analysis of the issue of whether a plaintiff abandons a claim by not addressing a motion to dismiss that claim in response, held that "until the Eleventh Circuit (or Supreme Court)

---

circumstances, properly consider exhibits not attached to a pleading when ruling on a motion to dismiss. *See, e.g.*, *Speaker*, 623 F.3d at 1379.   However, the undersigned has found it unnecessary to go outside "the four corners of the complaint" in ruling on the present motion and thus need not determine whether the exhibits may be considered.   *Id.*

speaks more clearly to the issue or a sister Court (or litigant) provides a more compelling rationale, the Court will not treat a claim as abandoned merely because the plaintiff has not defended it in opposition to a motion to dismiss." *Gailes v. Marengo Cnty. Sheriff's Dep't*, 916 F. Supp. 2d 1238, 1243 (S.D. Ala. 2013).[10] *See also Cochran v. Southern Co.*, Civil Action No. 14-0569-WS-N, 2015 WL 3508018, at *1 (S.D. Ala. June 3, 2015) (Steele, C.J.) (reaffirming *Gailes*).   Thus, the undersigned instead "will review the merits of the defendant's position and, if it is clearly incorrect or inadequate to satisfy the defendant's initial burden, will [recommend ]den[ial of] the motion despite the plaintiff's failure to respond.  If, however, the defendant's presentation is adequate to satisfy its initial burden, the [undersigned] will not [recommend ]den[ial of]  the motion based on arguments the

---

[10]     In a footnote immediately following this quoted language, *Gailes* stated: "The Court will of course treat such a claim as abandoned if the plaintiff has clearly manifested an intention to abandon it, as by express withdrawal or by a statement she is unopposed to the defendant's motion."  916 F. Supp. 2d at 1243 n.11.  The University cites this footnote from *Gailes* in urging the Court to dismiss Count 3 as abandoned.

It goes without saying that "[t]he opinion of a district court carries no precedential weight, even within the same district."  *United States v. Cerceda*, 172 F.3d 806, 812 n.6 (11th Cir. 1999) (en banc) (per curiam).  Moreover, *Gailes*'s statement in footnote 11 is dicta. The statement is certainly persuasive, and at least one circuit court of appeals agrees, though in an non-precedential unpublished opinion.  *See Gonzalez v. Aztex Advantage*, 547 F. App'x 424, 425-26 (5th Cir. Oct. 7, 2013) (per curiam) ("The Defendants filed a motion to dismiss, which Gonzalez's attorney responded to by stating that Gonzalez did 'not object' to the dismissal of his equitable relief claim under § 1132(a)(3). The district court granted the motion to dismiss on the  § 1132(a)(3) claim only, stating that the dismissal was 'by agreement' and that Gonzalez had abandoned the claim ... [T]he district court properly construed Gonzalez's non-objection as an agreement to dismiss his claim or an abandonment of his claim.").  However, El-Saba's Rehabilitation Act claim in Count 3 can dismissed on the merits under Rule 12(b)(6) without undue difficulty.

Additionally, the undersigned cannot construe El-Saba's abandonment of Count 3 as a motion to voluntarily dismiss this claim under Federal Rule of Civil Procedure 41(a)(2). *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1106 (11th Cir. 2004) ("Rule 41 allows a plaintiff to dismiss all of his claims against a particular defendant; its text does not permit plaintiffs to pick and choose, dismissing only particular claims within an action.  A plaintiff wishing to eliminate particular claims or issues from the action should amend the complaint under Rule 15(a) rather than dismiss under Rule 41(a)." (quotation omitted)).

plaintiff could have made but by silence elected not to raise." *Gailes*, 916 F. Supp. 2d at 1243-44.

The Rehabilitation "Act defines 'disability' to mean 'a physical or mental impairment that substantially limits one or more major life activities.' " *Garrett*, 507 F.3d at 1310 (quoting 29 U.S.C. § 705(9)(B)). Courts must "strictly interpret the terms 'major life activities' and 'substantially limits' so as 'to create a demanding standard for qualifying as disabled ....' " *Id.* at 1311 (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002)). "[M]ajor life activities mean 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' 29 C.F.R. § 1630.2(i) … [T]his list is not exhaustive, but applies to 'those basic activities that the average person in the general population can perform with little or no difficulty.' 29 C.F.R. App. § 1630.2(i)." *Id.* " '[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities. Such impairments may include, but are not limited to, broken limbs, sprained joints, concussions, appendicitis, and influenza.' " *Id.* (quoting 29 C.F.R.App. § 1630.2(j)).

El-Saba's Complaint does not allege facts plausibly indicating that his series of heart attacks rendered him "disabled" within the meaning of the Rehabilitation Act.[11] El-Saba admits that his own physician "advised that he was fit to resume his duties by January 2, 2014[,]" and he himself believed he could be available to return

---

[11] His allegation that "he was disabled within the meaning of the Rehabilitation Act" (Doc. 1 at 19, ¶ 91) is exactly the sort of "formulaic recitation of an element" that, standing alone, does not sufficiently plead a cause of action. *See Twombly,* 550 U.S. at 555.

to work "shortly after his second appointment on November 11, 2013." (Doc. 1 at 11 - 12, ¶¶ 56, 59). These facts do not plausibly suggest that El-Saba was "substantially limited" in a "major life activity" (in particular, "work"), and, in abandoning this claim, El-Saba has given the undersigned no reason to conclude otherwise. Accordingly, the undersigned **RECOMMENDS** that the University's motion to dismiss (Doc. 11) be **GRANTED** as to Count 3.

### B.    *Title VII Disparate Treatment Claim (Count 2)*

Title VII provides that it is unlawful for an employer to discriminate against an employee because of the employee's national origin. *See* 42 U.S.C. § 2000e–2(a)(1). "Although a Title VII complaint need not allege facts sufficient to make out a classic *McDonnell Douglas*[12] prima facie case, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S. Ct. 992, 997, 152 L. Ed. 2d 1 (2002), it must provide 'enough factual matter (taken as true) to suggest' intentional [unlawful] discrimination. *See Twombly*, 127 S. Ct. at 1965." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008) (alterations added). Recently, the Eleventh Circuit Court of Appeals expressly held that a district court applies the wrong legal standard in assessing the sufficiency of a Title VII complaint by determining whether the plaintiff has made out a *prima facie* case of discrimination under *McDonnell Douglas*, rather than applying the *Iqbal/Twombly* plausibility standard. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245-46 (11th Cir. June 16, 2015) (per curiam) (emphasizing that "*McDonnell Douglas*'s burden-shifting framework is an evidentiary standard, not a pleading requirement" (citing *Swierkiewicz*, 534 U.S. at

---

12  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

510)).[13]  *See also Swierkiewicz*, 534 U.S. at 511 ("This Court has never indicated

that the requirements for establishing a prima facie case under *McDonnell Douglas*

also apply to the pleading standard that plaintiffs must satisfy in order to survive a

---

[13]        *Surtain* addressed an appeal from a district court's denial of a motion for default
judgment under Federal Rule of Civil Procedure 55 and *sua sponte* dismissal of a complaint
with prejudice, rather than a motion to dismiss under Rule 12(b)(6).  However, *Surtain*
expressly held that the standard for entering a default judgment is "akin to that necessary
to survive a motion to dismiss for failure to state a claim" and that "[c]onceptually, then, a
motion for default judgment is like a reverse motion to dismiss for failure to state a claim."
789 F.3d at 1245.  The U.S. District Court for the Middle District of Georgia has begun
applying *Surtain* to Rule 12(b)(6) motions.   *See Brock v. Columbus Consol. Gov't*, No. 4:14-
CV-264 CDL, 2015 WL 3970728, at *4 (M.D. Ga. June 30, 2015) (Land, C.J.); *EEOC v. J &
R Baker Farms, LLC*, No. 7:14-CV-136 HL, 2015 WL 4753812, at *3 (M.D. Ga. Aug. 11,
2015) (Lawson, J.); *Green v. Savage of Georgia, LLC*, No. 1:14-CV-132 (LJA), 2015 WL
5120241, at *3 (M.D. Ga. Aug. 27, 2015) (Abrams, J.).

        Other circuit courts of appeal have expressly held that rigid application of the
*McDonnell Douglas* "*prima facie* case" test is inappropriate in the context of Rule 12(b)(6).
*See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) ("In rejecting all but two
of Carlson's [Title VII ]claims for failing to state a plausible claim for relief, the district
court applied the wrong standard. The court repeatedly faulted her for not providing
'evidence' in support of her claims, though of course evidence is not required at the pleading
stage.  And the court relied on summary judgment decisions that addressed not the content
of complaints but the evidence needed to take a claim to a jury.  The judicial pen may
sometimes slip inadvertently in these ways, but in this case the slips signaled accurately
that the court had applied too demanding a standard. We assess Carlson's claims under the
proper standard for Rule 12(b)(6) determinations." (citations omitted)); *Garayalde-Rijos v.
Municipality of Carolina*, 747 F.3d 15, 24 (1st Cir. 2014) ("[T]he district court faulted
Garayalde–Rijos for not stating specific facts that connect the alleged mistreatment after
she was hired to the filing of her EEOC complaint. In so doing, the district court treated
the prima facie case, a flexible evidentiary standard, as a rigid pleading standard, requiring
Garayalde–Rijos to establish each prong of the prima facie case to survive a motion to
dismiss. This was an error of law. []We have explicitly held that plaintiffs need not plead
facts in the complaint that establish a prima facie case under Title VII nor must they allege
every fact necessary to win at trial." (citation and quotations omitted)); *Crowder v. Railcrew
Xpress*, 557 F. App'x 487, 492 (6th Cir. Feb. 27, 2014) (per curiam) (unpublished) ("[W]e
must decide whether the district court properly dismissed Crowder's [Title VII ]retaliation
claim at the motion-to-dismiss stage. The district court held that Crowder's complaint 'f[ell]
short of her burden to establish a prima facie case for her retaliation claims.' This was error.
As this court recently made clear, a 'district court's requirement that [a plaintiff's]
complaint establish a prima facie case under *McDonnell Douglas* and its progeny is
contrary to Supreme Court and Sixth Circuit precedent.' *Keys v. Humana, Inc.,* 684 F.3d
605, 609 (6th Cir. 2012). That is because the prima facie case under *McDonnell Douglas* is
an evidentiary standard, not a pleading requirement.  *Id.* []The correct standard is the
'plausibility' standard in *Twombly* and *Iqbal*.").
        .

motion to dismiss."); *Castillo v. Allegro Resort Mktg.*, 603 F. App'x 913, 919 (11th Cir. Mar. 18, 2015) (per curiam) (unpublished)[14] ("[T]he district court's conclusion that Ms. Castillo must, at this stage, satisfy the prima facie showing required by *McDonnell Douglas* is inconsistent with Supreme Court precedent. *See Swierkiewicz*, 534 U.S. at 510, 122 S. Ct. 992. Thus, we conclude the district court erred in granting Allegro's motion to dismiss Ms. Castillo's claims of age and sex discrimination."); *Carlson*, 758 F.3d at 827 ("While fraud claims, for example, must be pled with particularity, Title VII claims are not subject to a heightened pleading standard.   Employers are familiar with discrimination claims and know how to investigate them, so little information is required to put the employer on notice of these claims." (citations omitted)).

Further elaboration by the Eleventh Circuit on how the *Twombly/Iqbal* "plausibility standard" applies to pleading Title VII claims, at least in published opinions, has been elusive.   However, recently and in a published opinion, the Second Circuit Court of Appeals, after thoroughly analyzing the interplay between *McDonnell Douglas, Swierkiewicz*, and *Iqbal*, held:

> It is uncertain how the Supreme Court will apply *Iqbal's* requirement of facts sufficient to support plausibility to Title VII complaints falling under the *McDonnell Douglas* framework. We conclude that *Iqbal's* requirement applies to Title VII complaints of employment discrimination, but does not affect the benefit to plaintiffs pronounced in the *McDonnell Douglas* quartet. To the same extent that the *McDonnell Douglas* temporary presumption reduces the facts a plaintiff would need to *show* to defeat a motion for summary judgment

---

[14] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.  *See also Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007) ("Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants.").

prior to the defendant's furnishing of a non-discriminatory motivation, that presumption also reduces the facts needed to be *pleaded* under *Iqbal.*

The *Iqbal* requirement is for facts supporting "plausibility." The Supreme Court explained that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S. Ct. 1937. The question we face is what, in the Title VII context, must be plausibly supported by factual allegations when the plaintiff does not have direct evidence of discriminatory intent at the outset. Answering this question requires attention to the shifting content of the prima facie requirements in a Title VII employment discrimination suit. Recapitulating what we have spelled out above, while the plaintiff ultimately will need evidence sufficient to prove discriminatory motivation on the part of the employer-defendant, at the initial stage of the litigation—prior to the employer's coming forward with the claimed reason for its action—the plaintiff does not need substantial evidence of discriminatory intent. If she makes a showing (1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation, then she has satisfied the prima facie requirements and a presumption of discriminatory intent arises in her favor, at which point the burden of production shifts to the employer, requiring that the employer furnish evidence of reasons for the adverse action … At this stage, a plaintiff seeking to defeat a defendant's motion for summary judgment would not need evidence sufficient to sustain her ultimate burden of showing discriminatory motivation, but could get by with the benefit of the presumption if she has shown evidence of the factors entitling her to the presumption.

The discrimination complaint, by definition, occurs in the first stage of the litigation. Therefore, the complaint also benefits from the temporary presumption and must be viewed in light of the plaintiff's minimal burden to show discriminatory intent. The plaintiff cannot reasonably be required to allege more facts in the complaint than the plaintiff would need to defeat a motion for summary judgment made prior to the defendant's furnishing of a non-discriminatory justification. *Cf. Swierkiewicz,* 534 U.S. at 511–12, 122 S. Ct. 992 ("It … seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to

succeed on the merits if direct evidence of discrimination is discovered.").

In other words, absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent. The facts alleged must give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation. The facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation.

*Littlejohn v. City of New York*, 795 F.3d 297, 310-11 (2d Cir. Aug. 3, 2015) (footnote

omitted).[15]  *See also Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir.

2013) ("[T]he elements of a prima facie case may be used as a prism to shed light

upon the plausibility of the claim. Although a plaintiff must plead enough facts to

make entitlement to relief plausible in light of the evidentiary standard that will

pertain at trial—in a discrimination case, the prima facie standard—she need not

plead facts sufficient to establish a prima facie case." (quoted favorably by *Littlejohn*,

795 F.3d at 311 n.9)).   Even more recently, the Second Circuit has refined the

reasoning in *Littlejohn* to hold:  "[T]o defeat a motion to dismiss or a motion for

---

[15] El-Saba does not argue in his response (Doc. 21) that any of the allegations in his Complaint constitute direct evidence of discrimination or retaliation with regard to his 2013 termination, and the undersigned finds that the Complaint does not allege any such direct evidence.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) ("Direct evidence is evidence that, if believed, proves the existence of a fact without inference or presumption. As our precedent illustrates, only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination.  If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence." (citations and quotations omitted)).

judgment on the pleadings in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, -- F.3d --, No. 14-2265-CV, 2015 WL 5127519, at *12 (2d Cir. Sept. 2, 2015) (published).   The undersigned finds the reasoning in *Littlejohn* and *Vega* to be persuasive and will apply it to the Title VII claims at issue here.

One method of showing a *prima facie* case for disparate treatment under Title VII involves showing that the plaintiff's employer treated similarly situated employees outside of his protected class more favorably than he was treated.  *E.g.*, *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam) (citing *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)); *Littlejohn*, 795 F.3d at 312 ("An inference of discrimination can arise from circumstances including, but not limited to, … 'the more favorable treatment of employees not in the protected group…'").  The University argues that El-Saba's disparate treatment claim is due to be dismissed because he has failed to allege facts plausibly showing that a similarly situated employee outside of his protected class was treated more favorably than him.

El-Saba first addresses this contention by arguing that he has alleged comparators demonstrating that Dean Steadman treated "resignations" by American-born professors differently than those of foreign-born professors.  (*See* Doc. 21 at 16 – 17).  As alleged in the Complaint, in July 2008, Dr. Alkhatib, a "non-

native" ECE Department professor, resigned his position but then attempted to withdraw his resignation. (Doc. 1 at 17). Dean Steadman declined to reinstate Dr. Alkhatib, claiming that the deadline to withdraw had passed by one day and that resources had been allocated elsewhere. (*Id.* at 17 – 18). According to El-Saba, the "resource allocation" claim is belied by the fact that the offer letter to Dr. Alkhatib's replacement was not mailed until six days after the effective date of the resignation. (*Id.* at 18).[16]   Later, Mark Adams, a tenure-track, "native born American" professor got an offer elsewhere and submitted his resignation in 2010-11. (Doc. 1 at 17). Dean Steadman offered Adams an incentive package to stay, but Adams rejected the offer and left the University. (*Id.*).

In El-Saba's own case, he complains that Dean Steadman "waited five days until August 20 to advise that he considered [El-Saba] to have resigned as of August 15[,]" "notwithstanding that he apparently could have notified [El-Saba] on August 14, more than a week before the first teaching day, August 22, of the import of the second communication and warned him of the consequences of failing to report on August 15. At least he could have advised [El-Saba] that the second letter was confusing or contradictory." (*Id.* at 13).   According to El-Saba, comparing Dean Steadman's treatment of Adams with his treatment of Alkhatib and El-Saba

---

[16]     Dr. Alkhatib filed a lawsuit with this Court against Dean Steadman and numerous trustees of the University, alleging claims of race discrimination (though not under Title VII) arising from his failed attempt to withdraw his resignation. *See Alkhatib v. John W. Steadman et al.*, S.D. Ala. Case No. 1:10-cv-00342-KD-C.   The Court granted summary judgment to the defendants on all claims on November 11, 2011. *See Alkhatib v. Steadman*, Civil Action No. 10-00342-KD-C, 2011 WL 5553775 (S.D. Ala. Nov. 15, 2011).

         At least one other University professor from the College of Engineering has unsuccessfully sued Dean Steadman for Title VII discrimination in this Court. *See Hossain v. Steadman*, 855 F. Supp. 2d 1307, 1317 (S.D. Ala. 2012).

"suggests that the Dean bent over backwards to retain the native born Adams past deadlines, but was in somewhat of a hurry to snap up the resignation of the nonnatives Alkatib and plaintiff ... All three were supervised by the Dean, and subject to the same deadline standards, but treated differently based on national origin." (Doc. 21 at 16 – 17).

Even leaving aside the fact that El-Saba was, in substance, terminated and did not resign, *see supra* n.6, the circumstances surrounding the departures of Adams, Alkhatib, and El-Saba are markedly dissimilar. This comparator evidence is the sort of "apples with oranges" comparison that the Eleventh Circuit has long held insufficient to show another employee is "similarly situated."[17] *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) ("In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar

---

[17] In his response brief, El-Saba claims that Dean Steadman "extended [deadlines] for Adams" in relation to his resignation. (Doc. 21 at 17). As the University correctly points out, such an assertion is not supported by the factual allegations in the Complaint, nor has El-Saba attached an exhibit confirming this. To the extent El-Saba believed such factual detail to be necessary, he should have filed an amended complaint to include them. *See* Fed. R. Civ. P. 15(a)(1)(B). Amendment of a pleading cannot be effected through a brief in response to a motion to dismiss. *See SE Prop. Holdings, LLC v. Braswell*, Civil Action No. 13-0267-WS-N, 2013 WL 4498700, at *5 n.6 (S.D. Ala. Aug. 21, 2013) ("[A]lthough plaintiff argues in its brief that George Braswell retained control or possession of the real property after transferring it to Vennie Braswell, and that the transfer consumed substantially all of his assets, those facts are not pleaded or supported in the Complaint. The sufficiency of plaintiff's Complaint must be evaluated based on its contents, not those of a subsequent memorandum of law."); *Woodard v. Town of Oakman*, 885 F. Supp. 2d 1216, 1227 n.7 (N.D. Ala. 2012) ("Plaintiffs and Defendant Wilson reference numerous additional facts in their briefs that are not included in the complaint at issue ... There is no law in this Circuit that a plaintiff may prevent dismissal for failure to state a claim by adding additional facts in his/her briefs, so long as they are 'consistent' with the complaint. The Court rejects all new factual assertions in both Plaintiffs' and Wilson's briefs."). Regardless, such an additional factual detail would not render Adams any more "similarly situated" to El-Saba and Alkhatib.

conduct and are disciplined in different ways.  The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed.   We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." (citations and quotations omitted)); *Burke-Fowler*, 447 F.3d at 1323 (same); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) ("The plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects.  The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." (citation and quotation omitted)); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1273 (11th Cir. 2004) ("When comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides race, since different treatment of *dissimilarly* situated persons does not violate civil rights laws." (citation and quotation omitted)).

Nevertheless, El-Saba also claims that "evidence of the Dean's historical national origin animus is relevant as background evidence" and, when considered as whole, would permit a plausible inference of discriminatory animus motivating his termination.  (Doc. 21 at 17).  In particular, he cites to Dean Steadman's alleged remarks about wanting to "change the demographics of" the ECE Department, his statements indicating a preference for hiring native-born applicants, and his imposition of policies that disfavored foreign-born applicants.   *See Chapter 7 Tr. v.*

26

*Gate Gourmet, Inc.*, 683 F.3d 1249, 1255-56 (11th Cir. 2012) ("[A] plaintiff may use non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination and thereby create a triable issue.  Whatever form it takes, if the circumstantial evidence is sufficient to raise a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." (citations and quotations omitted)); *Wilson*, 376 F.3d at 1087 ("The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation."); *Arafat v. Sch. Bd. of Broward Cnty.*, 549 F. App'x 872, 874 (11th Cir. Dec. 4, 2013) (per curiam) (unpublished) ("If a plaintiff fails to show the existence of a similarly-situated employee, judgment as a matter of law is appropriate **where no other plausible allegation of discrimination is present**." (emphasis added) (addressing Rule 12(b)(6) dismissal)), *cert. denied*, 135 S. Ct. 106 (2014); *Littlejohn*, 795 F.3d at 312 ("An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge … [A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." (quotation omitted))

The University does not directly confront El-Saba's attempt to establish an inference of discrimination through non-comparator allegations, instead simply dismissing them as a "litany of allegations that bear no connection to [El-Saba's] termination." (Doc. 12 at 10.  *See also* Doc. 23 at 8).  However, the undersigned finds that Dean Steadman's remarks about changing the department demographics and preferring to hire native-born applicants, considered along with El-Saba's examples of native-born ECE Department faculty and applicants allegedly receiving more favorable treatment than non-native born faculty and applicants, are sufficient to show a "minimal inference of discriminatory motivation" in Dean Steadman's termination of El-Saba.  *Cf. Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291-92 (11th Cir. 1998) ("Ross further testified that sometime prior to his being fired, Kirkland pointed to Ross and said 'You see that one over there, I am going to get rid of him.' … Ross contends that Kirkland's reference to 'that one over there' evinced racial animus by a decision maker who would ultimately fire him. []Ross also testified that sometime in 1990, Kevin Sweeney said 'I never seen as many blacks in this building except in a Tarzan movie.'  Even though Kirkland and Sweeney made their comments long before they fired Ross, that did not prevent Ross from using these statements as evidence to persuade the jury that it should disbelieve Rhodes's proffered reason.  []The district judge rejected the Tarzan remark as an 'isolated general racial remark,' unable to aid Ross in proving his case. The trial judge erred. Although we have repeatedly held that such comments are not direct evidence of discrimination because they are either too remote in time

or too attenuated because they were not directed at the plaintiff, we have not held that such comments can never constitute circumstantial evidence of discrimination. Other Courts of Appeals have indicated that such comments may provide circumstantial evidence to support an inference of discrimination. *E.g.*, *Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 521 (3rd Cir. 1997) ('Although stray remarks by non-decisionmakers alone are insufficient to establish discriminatory intent, we have held that such remarks can still constitute evidence of the atmosphere in which the employment decision was carried out.').'" (some citations omitted)); *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) (per curiam) ("In *Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286 (1998), we determined that potentially discriminatory comments that were not directly related to the employment decision could contribute to a circumstantial showing of discriminatory intent. *See id.* at 1291."); *Beaver v. Rayonier, Inc.*, 200 F.3d 723, 729-30 (11th Cir. 1999) ("In addition to the evidence of his relative qualifications, Beaver presented evidence that Royce Daniel, the general manager of the Jesup mill and the ultimate decision-maker in personnel decisions at the mill, including those concerning Beaver, had expressed a desire to attract 'younger, engineer-type employees or supervisors.' While Daniel's comment does not rise to the level of direct evidence of discrimination, and would not be enough standing alone to show a discriminatory motive, a jury could infer from it some age-bias on Daniel's part when that comment is coupled with the other evidence in this case."); *Castillo*, 603 F. App'x at 919 ("The district court concluded that Mr. Namnum's statement to Ms. Castillo that he wanted to give her job to 'a

young boy' was amenable to multiple interpretations and, therefore, could not constitute direct evidence of discrimination. This reasoning fails to take into account the abundant related factual allegations Ms. Castillo asserted. **At a minimum, these allegations could, through discovery, yield circumstantial evidence of intentional discrimination.**" (emphasis added)).

Based on the foregoing, the undersigned concludes that El-Saba has plausibly pled a claim of discriminatory termination under Title VII. Accordingly, the undersigned **RECOMMENDS** that the University's motion to dismiss (Doc. 11) be **DENIED** as to Count 2.

### C. *Title VII Retaliation Claim (Count 1)*

"As with [*Littlejohn*'s] analysis of the disparate treatment claim, the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII [retaliation ]litigation." *Littlejohn*, 795 F.3d at 316. "Thus, for a retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 2015 WL 5127519, at *14 (quoting 42 U.S.C. § 2000e–3(a)).

> Unlike Title VII discrimination claims, however, for an adverse retaliatory action to be "because" a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a "but-for" cause of the employer's adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar,* ——U.S. ——, ——, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). It is not enough that retaliation was a "substantial" or

"motivating" factor in the employer's decision. *See id.* " '[B]ut-for' causation does not[, however,] require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 846 (2d Cir. 2013).[18]

*Id.*

Here, El-Saba has alleged that Dean Steadman terminated him in August 2013 "in retaliation for his on going [sic] complaints that Dr. Steadman was a racist." (Doc. 1 at 13, ¶ 65). The University challenges the sufficiency of El-Saba's allegations demonstrating "causal link" between his protected activity and his termination. Specifically, the University points out that "[a]ll of his alleged protected activities" – the latest being his 2011 statement to the EEOC – "took place at least two years prior to his termination" in August 2013.[19] (Doc. 12 at 6).

"To establish a prima facie case of Title VII retaliation, [plaintiffs] must show that (1) they engaged in statutorily protected activity; (2) they suffered a materially adverse employment action; and (3) there was a causal link between the two." *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 856 (11th Cir. 2010). "[Courts] construe the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the adverse action are not completely unrelated." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quoting *Olmsted v. Taco Bell*

---

[18] The Eleventh Circuit has interpreted *Nassar* similarly. *See Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 981 (11th Cir. Oct. 23, 2014) (per curiam) (unpublished) ("In 2013, the Supreme Court in *University of Texas Southwestern Medical Center v. Nassar* ... held that a plaintiff must prove but-for causation—that the unlawful retaliation would not have occurred in the absence of the protected activity—to establish a claim of retaliation under Title VII.").

[19] El-Saba agrees, in response to the motion to dismiss, that his "last protected activity was his statement to the EEOC in 2011." (Doc. 21 at 2).

*Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)).  As the University notes, the Eleventh Circuit has held that "[a] plaintiff satisfies this element if she provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action.  A close temporal proximity between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." *Id.* (citation and quotations omitted).  *Accord, e.g.*, *Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 981 (11th Cir. Oct. 23, 2014) (per curiam) (unpublished) ("We previously have held that a plaintiff can satisfy the causation element by presenting sufficient evidence that the decision-maker was aware of the plaintiff's protected conduct, and a close proximity between this awareness and the adverse employment action existed." (citing *Higdon*, 393 F.3d at 1220)).

The University argues that "El-Saba cannot establish the temporal proximity **required by** the Eleventh Circuit to state a claim for retaliation, and his Count I fails as a matter of law." (Doc. 12 at 6 – 7 (emphasis added)).  However, "close temporal proximity" is but one method of demonstrating a causal link.  "If there is a substantial delay between the protected expression and the adverse action," a "complaint of retaliation fails as a matter of law" only "**in the absence of other evidence tending to show causation**..." *Higdon*, 393 F.3d at 1220 (emphasis added).  *See also Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("[M]ere temporal proximity, **without more**, must be 'very close.' " (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (emphasis added)).

> Where there was a significant time gap between the protected activity
> and the adverse action, the plaintiff must offer additional evidence to
> demonstrate a causal connection, such as a pattern of antagonism or
> that the adverse action was the first opportunity for the employer to
> retaliate. *See, e.g., Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173,
> 177 (3d Cir. 1997) (evidence of a "pattern of antagonism" following the
> protected activity may give rise to the inference of causation); *Dale v.
> Wynne,* 497 F. Supp. 2d 1337, 1346 (M.D. Ala. 2007) ("In this instance,
> a six-week gap is enough to show temporal proximity, particularly
> because Dale's return to work was the first opportunity Wilson had to
> retaliate against her.").

*Ward v. United Parcel Serv.*, 580 F. App'x 735, 739 (11th Cir. Sept. 11, 2014) (per

curiam) (unpublished).  *Accord Jones v. Suburban Propane, Inc.*, 577 F. App'x 951,

955 (11th Cir. Aug. 19, 2014) (per curiam) (unpublished) (same); *Lettieri v. Equant

Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) ("In cases where 'temporal proximity between

protected activity and allegedly retaliatory conduct is missing, courts may look to

the intervening period for other evidence of retaliatory animus.'  *Farrell v. Planters

Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir. 2000) (internal quotation omitted).

Specifically, evidence of recurring retaliatory animus during the intervening period

can be sufficient to satisfy the element of causation."); *Porter v. Cal. Dep't of Corr.*,

419 F.3d 885, 895 (9th Cir. 2005) (similar).  *See also Henderson v. FedEx Express*,

442 F. App'x 502, 506 (11th Cir. Oct. 6, 2011) (per curiam) (unpublished) ("Close

temporal proximity between the protected activity and the adverse action may be

sufficient to show that the two were not wholly unrelated … If there is a delay of

more than three months between the two events, then the temporal proximity is not

close enough, and the plaintiff must offer some other evidence tending to show

causation." (citing *Thomas,* 506 F.3d at 1364)).

33

Moreover, the University has not cited to any circuit court "case dismissing a Title VII retaliation claim under Rule 12(b)(6) utilizing only a temporal analysis to defeat causation allegations.  Once a complaint has alleged enough facts that retaliation for protected conduct is plausible, the plaintiff is entitled to proceed to discovery.  And discovery might unearth evidence of retaliation such that at summary judgment or trial, the plaintiff will not have to rely heavily on the temporal proximity between protected conduct and adverse actions to prove her case." *Garayalde-Rijos*, 747 F.3d at 25 n.8.  At the motion to dismiss stage, a court cannot simply engage in a "rote evaluation of [a] time lag" in evaluating the sufficiency of a retaliation claim, but instead must read the "complaint holistically and" take into account "relevant context."  *Id.* at 25 (citing *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (explaining that the complaint should be read in its entirety and "not parsed piece by piece to determine whether each allegation, in isolation, is plausible")).[20]  *See also Carlson*, 758 F.3d at 829 ("[N]o bright-line timing rule can be used to decide whether a retaliation claim is plausible or whether it should go to a jury. Other factors can always be relevant. A mechanistically applied time frame would ill serve our obligation to be faithful to the legislative purpose of Title VII. The facts and circumstances of each case

---

[20] However, the First Circuit did "not rule out that some pleadings may allege a temporal gap so attenuated as not to meet the plausibility standard for surviving motions to dismiss…"  *Garayalde-Rijos*, 747 F.3d at 25.  *See also Carlson*, 758 F.3d at 828 ("[A] retaliation claim can indeed be so bare-bones that a lengthy time period between the protected activity and the alleged retaliation will make any causal connection between the two implausible.  If the best a plaintiff can do is allege that he engaged in protected activity and then, years later, the employer took an adverse action against him, the claim may not be permitted to proceed.").

necessarily must be evaluated to determine whether an interval is too long to permit a jury to determine rationally that an adverse employment action is linked to an employee's earlier complaint."  (quotation omitted)).

El-Saba does not dispute that the gap of approximately two years between his last protected activity – his giving a statement to the EEOC sometime in 2011 – and his termination in mid-August 2013 is likely insufficient, standing alone, to plausibly show a causal connection between the two.  *Compare Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."); *Jones*, 577 F. App'x at 955 ("There was a gap of more than two years between the 2010 discrimination charge Jones filed against Suburban and his termination[ around June 2010].  Jones therefore could not rely on temporal proximity alone to establish that his termination was causally related to his protected activity."), *with Littlejohn*, 795 F.3d at 319-20 ("Littlejohn's allegations that the demotion occurred within days after her complaints of discrimination are sufficient to plausibly support an indirect inference of causation.").  Nevertheless, El-Saba claims that other factual allegations in his Complaint demonstrate a retaliatory pattern of behavior sufficient to plausibly suggest a causal connection between his protected activity and his termination.  *See Carlson*, 758 F.3d at 829 ("Carlson has alleged that the resolution of her 2007 lawsuit in 2009 sparked animosity right away and that all of her attempts to advance at CSX since then have been thwarted.  She has described an ongoing campaign of retaliation, and her claims must be viewed through that

lens."). This "pattern of [retaliatory ]antagonism" El-Saba alleges can be summarized as follows:[21]

- around May 2006 (end of academic year) – At a meeting, El-Saba accuses Dean Steadman of racial discrimination against Middle Eastern professors with respect to salary raises for 2004-2006. The next day, Dean Steadman asked Chairman Alam how he could allow El-Saba to accuse him of racism.

- 2007/early 2008 – At an ECE Department meeting, El-Saba and others complain of Dean Steadman's statements about hiring only native born, natural English speaking faculty.

- April 2008 – At another meeting, El-Saba raises the issue of whether qualified candidates were being excluded under Dean Steadman's policy of excluding applicants holding H1B visas.

- around August 2008 - El-Saba requests one semester of leave to have dental surgery done overseas. Dean Steadman limits El-Saba to six weeks with a return-to-work date of October 21, 2008.

- May 2009 – Dean Steadman instructs Chairman Alam to evaluate El-Saba's performance for the 2008-2009 academic year in a manner that did not

---

[21] Under Title VII's retaliation provision, "an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter[,]' " nor may an employer "retaliate against an employee because the employee 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' " *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (quoting 42 U.S.C. § 2000e–3 (a)) (alteration added). "[T]he protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those … who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam).

adequately account for the fact that El-Saba was on leave for a large portion of the fall semester, resulting in a lower evaluation score and "jeopardizing" El-Saba's raises and promotions.

- Fall 2009 – El-Saba gives his first statement to the EEOC regarding Dean Steadman.

- April 23, 2010 – At a meeting, Dean Steadman cancels the Excellence in Research Award for which El-Saba has been nominated (possibly the only nominee), and El-Saba accuses Dean Steadman of canceling the award out of "revenge."  Dean Steadman becomes angry and, shortly after the meeting, tells Chairman Alam, "I'll make it so tough on him he'll have to resign."  In the Fall of 2010, El-Saba complains of the award cancellation and Dean Steadman's remark to other University officials.

- Sometime during 2010-2011 academic year – El-Saba informs University officials that he has abstained from revoting on approving tenure and a promotion for Dr. Alkhatib's because he believed it was done to further Dean Steadman's discriminatory policies against foreign-born faculty.

- Sometime in 2011 prior to Fall – El-Saba gives his second statement to the EEOC regarding Dean Steadman.

- Fall 2011 – El-Saba asked for a teaching load reduction from three to two courses, and from five to four days, to accommodate his wife's Friday chemotherapy treatments on Fridays.  Dean Steadman grants this reduction with a 20% pay reduction by charging El-Saba's "accumulated FMLA."

- May 2012 – Dean Steadman complains to Chairman Alam for approving one year of unpaid medical leave for El-Saba without his input.

- August 1, 2013 – Dean Steadman overrules Chairman Alam's grant of El-Saba's request for a one-year extension of unpaid medical leave, requires that El-Saba advise within 24 hours whether he would be on campus August 15.

- August 20, 2013 – Dean Steadman terminates El-Saba for not reporting to the University August 15.

- September 18, 2013 (approximately) – Dean Steadman denies El-Saba's appeal of the termination.

In its reply, the University continues to focus almost exclusively on the temporal proximity between the various alleged protected activities and retaliatory actions in arguing that El-Saba has failed to sufficiently show causation.[22]

---

[22] In its reply, the University has also argued that El-Saba's "contention of a chain of retaliatory events is undercut by his own intervening act of failing to report for work in August 2013." (Doc. 23 at 4 (citing *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. Oct. 6, 2011) (per curiam) (unpublished) ("Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." (citing Eight Circuit authority); *Trainer v. Supreme Bev. Co.*, 2013 WL 169288, at *6 (N.D. Ala. Jan. 10, 2013) (plaintiff's conduct shortly before his termination broke any possible causal link)). The cases cited by the University to support this contention are not binding authority, *see* n.14, *supra*, and at least one other judge of this district has found the cited reasoning in *Henderson* to be unpersuasive. *See Gross-Jones v. Mercy Med.*, 874 F. Supp. 2d 1319, 1343-46 (S.D. Ala. 2012) (Steele, C.J.). The undersigned agrees that the "*Henderson* approach appears to go well beyond the purpose of the prima facie case." *Id.* at 1345. "Intervening acts" are more appropriately analyzed after a *McDonnell Douglas prima facie* case is shown, when the employer may then articulate legitimate, non-discriminatory/retaliatory reasons for the adverse employment action. In pleading his Title VII claims, El-Saba is not even required to allege a "classic" *McDonnell Douglas prima facie* case, much less also rebut possible nondiscriminatory reasons as pretextual.

"Title VII … does not set forth 'a general civility code for the American workplace.' *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)[,]" and "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. *See* 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that 'courts have held that personality conflicts at work that generate antipathy' and ' "snubbing" by supervisors and co-workers' are not actionable under § 704(a))." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). "Some of [Dean Steadman's] actions, considered individually, might not amount to much." *Vega*, 2015 WL 5127519, at *17.[23]

Nevertheless, El-Saba's well-pleaded factual allegations, "[t]aken together, … plausibly paint a mosaic of retaliation and an intent to punish [El-Saba] for complaining of discrimination." *Id.* Specifically, El-Saba's well-pleaded factual allegations indicate the following: (1) on at least one occasion, Dean Steadman expressed dissatisfaction with El-Saba's complaints of perceived discrimination; (2) approximately four months after El-Saba voices complaints about Dean Steadman's policy to exclude applicants holding H1B visa, Dean Steadman reduced El-Saba's request for dental leave, then, at the end of the academic year, refused to take El-Saba being on leave into account when evaluating his performance for the year,

---

[23] In particular, El-Saba appears to take it as "given" that the Court would assume Dean Steadman should have just granted his multiple requests for medical leave in full, no questions asked. However, he has alleged nothing indicating that Dean Steadman was more generous to others in this regard.

resulting in a less favorable evaluation;[24] (3) the semester after El-Saba gave his first statement to the EEOC, Dean Steadman, without explanation, canceled an award for which El-Saba is the only nominee, then, after El-Saba complained of this, told Chairman Alam: "I'll make it so tough on him he'll have to resign;" and (4) Dean Steadman intervened on El-Saba's 2013 request to extend his medical leave by one year, after Chairman Alam had originally granted it and had already granted him a previous year of leave.

While the events making up this mosaic take place over several years and are themselves interspersed by gaps of months and sometimes years, El-Saba has cited to authority suggesting that the unique structure of school years can be a consideration in determining the sufficiency of a causal connection.  *See Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 632 (7th Cir. 2009) ("[T]he [district ]court determined that Darchak failed to demonstrate that 'Acevedo's comments were causally related to her decision not to renew [Darchak's contract].' ... This appears to be a question of timing. But the bare fact that Darchak was not fired immediately after Acevedo allegedly made these remarks does not destroy the potential causal connection. The structure of the school year dictated the employment timetable, and Acevedo may not have been able to recommend nonrenewal of Darchak's contract any earlier than she did.").   Given the University's myopic focus on "close temporal proximity" alone as an indicator of causation while giving only passing consideration to El-Saba's "mosaic of

---

[24] "[A] poor performance evaluation could very well deter a reasonable worker from complaining."  *Vega*, 2015 WL 5127519, at *16.

retaliation" argument, the undersigned finds that El-Saba has alleged sufficient facts plausibly stating a claim of retaliation under Title VII.

Accordingly, the undersigned **RECOMMENDS** that the University's motion to dismiss (Doc. 11) be **DENIED** as to Count 2.[25]

### D.    *Rule 11 Violation*

The undersigned notes that El-Saba's Complaint (Doc. 1), filed *pro se*, is not signed as required by Federal Rule of Civil Procedure 11(a) ("Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name--or by a party personally if the party is unrepresented … The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention.").  El-Saba is now represented by counsel.   As such, in the event the Court permits this action to proceed, the undersigned further **RECOMMENDS** that El-Saba's counsel be given a reasonable period in which to file a notice of endorsement of the Complaint (Doc. 1), as provided

---

[25] The University has also, "[o]ut of an abundance of caution," moved to dismiss for failure to exhaust administrative remedies any Title VII claims El-Saba may be attempting to assert that are not based on his 2013 termination.  El-Saba does not assert that he is making any such claims in his response (Doc. 21), and the undersigned does not read the Complaint to be doing so, as El-Saba makes it reasonably clear that both Title VII claims are based on his termination.  (*See* Doc. 1 at 9 (stating a claim for "retaliatory termination" in Count 1); 13 ¶ 65 ("Plaintiff alleges that his termination was in retaliation for his on going complaints that Dr. Steadman was a racist."); 15 (stating a claim for "termination by resignation because of national origin"); 18 – 19, ¶¶ 87 – 88 ("The reason for terminating plaintiff and denying his appeal … was pretextual" and "was also motivated by Steadman's national origin discrimination …").  To the extent the University is arguing that other adverse actions against El-Saba should not be considered because El-Saba never filed EEOC charges on them, the exhaustion requirement for Title VII claims does not "bar an employee from using the prior acts as background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

for on page 10 of the Court's *Administrative Procedures for Filing, Signing, and Verifying Pleadings and Documents by Electronic Means*.

## V.   Conclusion and Recommendations

In accordance with the foregoing analysis, it is **RECOMMENDED** that the University's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) (Doc. 11) be **GRANTED** only as to El-Saba's Rehabilitation Act cause of action in Count 3 of the Complaint (Doc. 1), and that it be otherwise **DENIED**.   In the event the Court permits this action to proceed after ruling on the Motion to Dismiss, it is further **RECOMMENDED** that El-Saba's counsel be given a reasonable period to correct El-Saba's Rule 11(a) violation in filing his Complaint without a signature, as set forth in Section IV(D), *supra*.

## VI.   Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P 72(b); SD ALA LR 72.4.  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal

for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 22nd day of September 2015.

*/s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**