EXHIBIT  1

John Steadman

| From: | John Steadman |
|---|---|
| Sent: | Tuesday, August 20, 2013 3:01 PM |
| To: | Aed El-Saba |
| Cc: | David Johnson; Mohammad Alam; James Laier |
| Subject: | Request For Leave |

Dear Dr. El-Saba:

I am in receipt of your e-mail of August 15, 2013. Included with your email was a medical report prepared by your doctor, dated August 14, 2013, at your request. In that report your doctor states that you are "fit to resume [your] routine work." While you have communicated that concerns of continuity of care would call for you to be away from Mobile for the follow-up medical visits scheduled for September 2, 2013 and November 11, 2013, given that you are currently fit to resume work and have no travel restrictions, a leave of an entire semester (shortened from your original request for a year) appears unnecessary and would not be considered reasonable.

In your email of August 5, before any decision was made by the University regarding your leave request, you stated that you would not be at work on August 15, 2013, the required start date for faculty in the College of Engineering. Because that date has now passed, and your request for leave is not granted, it is understood that you will not be performing your faculty duties, and therefore you are deemed to have resigned your position at the University.

Best regards,

John Steadman

*** Please note new email address: jsteadman@southalabama.edu ***

John W. Steadman, P.E., Ph.D.
Dean of Engineering
University of South Alabama
150 Jaguar Dr., Shelby Hall 2114
Mobile, AL 36688

Phone: 251-460-6140
Fax: 251-460-6343
Email: jsteadman@southalabama.edu

1



EXHIBIT
Steadman
14

tabbies

USA 000091

# EXHIBIT 2

 Mail

David Johnson <djohnson@southalabama.edu>

## Re: Request for Leave
1 message

Aed El-Saba <ael-saba@southalabama.edu>
To: David Johnson <djohnson@southalabama.edu>
Tue, Aug 13, 2013 at 6:58 AM
Cc: John Steadman <jsteadman@southalabama.edu>, Mohammad Alam <malam@southalabama.edu>, James
Laier <jlaier@southalabama.edu>

Dr. Johnson,

The attached is the requested letter. A second letter (confirms the same) but includes more details will be
available within 48 hours. I will e-mail this one also and I will mail all originals documents to the HR office.

Thank you

Aed El-Saba

On Mon, Aug 12, 2013 at 5:40 AM, Aed El-Saba <ael-saba@southalabama.edu> wrote:
Dear Dr. Johnson,

I submitted the medical certificate letter per your request this morning and paid the fees (see the attached
please). My medical records will be made available to the doctor first thing in the morning and the report will be
ready by noon tomorrow (morning your time). I will e-mail copies shortly after that.

Regards,

Aed El-Saba

On Wed, Aug 7, 2013 at 2:53 AM, Aed El-Saba <ael-saba@southalabama.edu> wrote:
Dear Dr. Johnson,

Thank you for your response on behalf of Dr. Steadman.

I am sure I will be ready to to return to work by Jan 02, 2014. Upon his return from a national 4 days
celebration holiday (following the holy month of Ramadan) that starts evening today and extends till Sunday,
I ill contact my doctor and have him write a letter as you requested.

Sincerely,

Aed El-Saba

EXHIBIT
Steadman
15
PENGAD 800-631-6989

On Tue, Aug 6, 2013 at 9:58 AM, David Johnson <djohnson@southalabama.edu> wrote:
Dear Dr. El-Saba: I am writing on behalf of Dr. Steadman who is out of town this week. Thank you for your email
of August 5. You have stated that you will not be able to return to work on August 15, 2013, because of your
scheduled physician appointments. As you were informed, due to staffing needs, we are unable to grant your
request for a one year leave of absence. In order for us to consider whether we can agree to grant your leave
request for the Fall semester of 2013, we must know whether you will be back by January 2, 2014. To that end, we

USA 000391

EXHIBIT 15



GOVERNMENT OF DUBAI

هيـئـة الصـحـة بدبـي
DUBAI HEALTH AUTHORITY

## SICK LEAVE CERTIFICATE

Hospital: **DUBAI HOSPITAL**

Date / Time of Issue: **13/08/2013 11:56**

Cert No: **DH/2013/20537**

| Patient's Name: **AED M ELSABAE** | Health Card: **88302245** |
|---|---|
| Nationality: **UNITED STATES OF AMERICA** | Sex: **Male** |

**Fitness**

This is to certify that the above patient was admitted to the hospital on 16/07/2013 and discharged on 18/07/2013

The patient is fit to work from 01-01-2014

**Diagnosis :**     ACUTE CORONARY SYNDROME

**Comments :**

| Doctor's Name: PARVEEZ AHAMAD ZARGER | |
|---|---|
| Signature: | Stamp: *PARVEEZ AHAMAD ZARGER* |

Notes:
1- Certificate is invalid if any corrections are made.
2- Certificate is valid only if it is signed and stamped.
3- Certificate is issued at patient's request.

USA 000398

# EXHIBIT 3



Mail                                                    David Johnson <djohnson@southalabama.edu>

## Re: Request for Leave
1 message

**Aed El-Saba** <ael-saba@southalabama.edu>                          Tue, Aug 13, 2013 at 3:36 AM
To: David Johnson <djohnson@southalabama.edu>
Cc: John Steadman <jsteadman@southalabama.edu>, Mohammad Alam <malam@southalabama.edu>, James
Laier <jlaier@southalabama.edu>

Dear Dr. Johnson,

As indicated in my last e-mail two days ago, the attached is a more detailed medical report contains summary of
operations performed and confirmation of fit to routine work statement.

I will be visiting the campus after finishing my first appointments I will stop by the HR office to provide all original
documents and will set appointments to see Dr. Alam and dean Steadman.

Thank you

Aed El-Saba

On Tue, Aug 13, 2013 at 6:56 AM, Aed El-Saba <ael-saba@southalabama.edu> wrote:
Dr. Johnson,

The attached is the requested letter. A second letter (confirms the same), but includes more details will be
available within 48 hours. I will e-mail this one also and I will mail all originals documents to the HR office.

Thank you

Aed El-Saba

On Mon, Aug 12, 2013 at 5:40 AM, Aed El-Saba <ael-saba@southalabama.edu> wrote:
Dear Dr. Johnson,

I submitted the medical certificate letter per your request this morning and paid the fees (see the attached
please). My medical records will be made available to the doctor first thing in the morning and the report will
be ready by noon tomorrow (morning your time). I will e-mail copies shortly after that.

Regards,

Aed El-Saba

On Wed, Aug 7, 2013 at 2:53 AM, Aed El-Saba <ael-saba@southalabama.edu> wrote:
Dear Dr, Johnson,

Thank you for your response on behalf of Dr. Steadman.

I am sure I will be ready to to return to work by Jan 02, 2014. Upon his return from a national 4 days



PENGAD 800-631-6989
EXHIBIT
Steadman
16

USA 000399

GOVERNMENT OF DUBAI

شــيــئــة الصــحــة بدبـــي
DUBAI HEALTH AUTHORITY

DUBAI HOSPITAL

مستشفــى دبــي

14th August 2013

## TO WHOM IT MAY CONCERN

| | | |
|---|---|---|
| **MEDICAL REPORT ON** | : | **AED M ELSABAE** |
| **HEALTH CARD NO.** | : | **88302245** |
| **DATE OF BIRTH** | : | **02-11-1961** |
| **NATIONALITY** | : | **USA** |

### Diagnoses:
- Hypertension
- Coronary artery disease

### History:
Mr. Aed M Elsabae is a 51-year-old gentleman, known to have hypertension, ischemic heart disease (percutaneous coronary intervention (PCI) to left anterior descending artery (LAD) two years ago), had history of exertional chest pain. He underwent coronary angiogram in a private hospital on 15/07/2013 which revealed multi-vessel coronary artery disease. He was admitted electively to our hospital on 16/07/2013 for possible multi-vessel percutaneous coronary intervention (PCI).

### Investigations

| | |
|---|---|
| WBC | : 10.2 10^3/uL |
| RBC | : 4.78 10^6/uL |
| Hemoglobin | : 14.5 g/dL |
| HCT | : 42.7 % |
| Platelet Count | : 233 10^3/uL |
| Creatinine | : 1.2 mg/dL |
| Urea | : 40 mg/dL |
| Chloride | : 106 mmol/L |
| $CO_2$ | : 27.4 mmol/L |
| Potassium | : 4.1 mmol/L |
| Sodium | : 140 mmol/L |
| PT | : 13.0 Secs |
| RATIO | : 1.2 |
| INR | : 1.2 |
| APTT | : 27.9 Secs |
| Cholesterol | : 107 mg/dL |
| Triglycerides | : 89 mg/dL |
| HDL | : 34 mg/dL |
| LDL | : 55 mg/dL |
| Glucose, Fasting | : 95 mg/dL |
| HBA1c | : 5.7% |

EXHIBIT
Steadman
17
PEN0AD 800-631-6989

ص.ب : ٧٢٧٢ - دبي - إ م ع ا   هاتف: ٢٧١٤٤٤٤ ٤ ٩٧١+   فاكس : ٢٧١٩٢٤٠ ٤ ٩٧١+

USA 000406

GOVERNMENT OF DUBAI

هـيئـة الصـحــة بدبـي
DUBAI HEALTH AUTHORITY

DUBAI HOSPITAL

مستشفى دبي

Page 2 of 2

**PATIENT NAME** : AED M ELSABAE

**HEALTH CARD NO** : 88302245

**Coronary Angiography:**
- Left main artery: Normal
- LAD: Ostial subtotally occluded in-stent restenosis.
- First diagonal artery (D1): ostial 90% tight lesion
- Left Circumflex artery (LCX): ostial 85% lesion
- Right coronary artery (RCA): long mid segment 90% lesion
- Posterior descending artery (PDA) has ostial 90% lesion.
- PCI done to RCA and PDA: predilated PDA and RCA, then 2.5x18mm SCAFFOLD ABSORB deployed to PDA, and 3x28mm SCAFFOLD ABSORB to mid RCA overlapped distally with 2.5x18mm SCAFFOLD ABSORB, all post-dilated.
- PCI to LM-LAD-LCX bifurcation done; predilated, then stented D1 with 2.25x15mm XIENCE XPEDITION DES, kissing balloon done, then stented LM-LAD with 4x18mm XIENCE PRIME DES, re-crossed struts to LCX, stented LCX with 4x12mm XIENCE PRIME DES, final kissing balloon done. Good final results.

**Current medications:**
1. Aspirin 100mg po OD
2. Ticagrelor 90mg BD
3. Lipitor 80mg HS
4. Lisinopril 5mg OD
5. Metoprolol 12.5mg BD

**Summary:**
Mr. Aed M Elsabae is a known case of hypertension, coronary artery disease. He recently underwent multi vessel PCI in our hospital. He was discharged on optimal anti-ischaemic medications and is doing well. He is fit to resume his routine work.

This medical report is issued at the request of the patient.

**Dr. Parveez Ahamed Zarger**
**Specialist Registrar, Cardiology Department**
**Dubai Heart Center, Dubai Hospital**

Dr. Ahmed ... Mohammed
Spe... ...
Dubai ...Center
Dubai Hospital

**Dr. Talib K. Majwal, MD, FRCP, FACC**
**Consultant Interventional Cardiologist**
**Dubai Heart Center, Dubai Hospital**

هـيئـة الصـحـة بدبـي
DUBAI HEALTH AUTHORITY
DUBAI HOSPITAL مستشفى دبي

:bg

ص.ب: ٧٢٧٢ - دبـي - ا.ع.م. هاتف: ٢٧١٤٤٤٤ ٩٧١+ فاكس: ٢٧١٩٣٤٠ ٩٧١+

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| AED EL-SABA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION NUMBER: |
| | * | 1:15-CV-00087-KD-N |
| UNIVERSITY OF SOUTH ALABAMA, | * | |
| | * | |
| Defendant. | * | |

## DEFENDANT'S AMENDED PRIVILEGE LOG[1]

| DATE | DESCRIPTION | PRIVILEGE |
|---|---|---|
| 07/23/13 | Email from Gerald Gattis to Jean Tucker and Kristin Daniels regarding El-Saba's personal leave extension request (see USA 002009); | Attorney-Client |
| 09/19/13 | Email from David Johnson to Jean Tucker and cc: to John Steadman regarding 09/19/13 meeting with El-Saba (see USA 002010); | Attorney-Client |
| 08/27/13 | Emails between Kristin Daniels, John Steadman, David Johnson, and James Laier regarding response to El-Saba; | Attorney-Client/ Work Product |
| 08/26/13 | Email from David Johnson to Jean Tucker and Kristin Daniels regarding El-Saba email of 08/26/2013; | Attorney-Client |
| 08/27/13 | Emails between David Johnson, John Steadman, Jean Tucker, Kristin Daniels, and James Laier regarding El-Saba 08/26/13 email; | Attorney-Client |
| 01/27/14 | Email from John Steadman to David Johnson and Jean Tucker and cc: to Ronda Girardeau and Kristin Dukes regarding El-Saba letter; | Attorney-Client |
| 11/22/13 | Emails between John Steadman, Jean Tucker, David Johnson, Kristin Daniels, and Ronda Girardeau regarding El-Saba; | Attorney-Client/ Work Product |
| 08/27-08/28/13 | Emails between David Johnson, John Steadman, Jean Tucker, Kristin Daniels, and James Laier regarding meeting with El-Saba; | Attorney-Client/ Work Product |

---

[1] Jean Tucker is the University Attorney, and Kristin Daniels Dukes is Associate University Attorney.

1

3

| DATE | DESCRIPTION | PRIVILEGE |
|---|---|---|
| 11/22/13 | Emails between Jean Tucker, Ronda Girardeau, John Steadman, David Johnson, and Kristin Daniels regarding El-Saba's resignation; | Attorney-Client/ Work Product |
| 10/28/13 | Email from John Steadman to David Johnson, Jean Tucker, and copying Ronda Girardeau letter to Kristin Daniels, regarding letter to El-Saba; | Attorney-Client/ Work Product |
| 10/01/13 | Emails between John Steadman, Kristin Daniels, David Johnson, Jean Tucker, and Ronda Girardeau regarding El-Saba's leave request; | Attorney-Client/ Work Product |
| 10/01/13 | Email from John Steadman to Ronda Girardeau and Kristin Daniels regarding El-Saba leave denial; | Attorney-Client/ Work Product |
| 08/28/13 | Emails between John Steadman, David Johnson, Kristin Daniels, and James Lajer regarding meeting with El-Saba; | Attorney-Client/ Work Product |
| 08/23/13 | Emails between David Johnson, Kristin Daniels, Ronda Girardeau, Nicole Cofron, and Jean Tucker regarding letter for El-Saba; | Attorney-Client/ Work Product |
| 08/23/13 | Emails between Ronda Girardeau, Kristin Daniels, Nicole Cofron, Jean Tucker, David Johnson, and John Steadman regarding letter for El-Saba. | Attorney-Client/ Work Product |
| 08/22/13 | Email from John Steadman to Ronda Girardeau for David Johnson and Jean Tucker/Kristin Daniels regarding letter for El-Saba; | Attorney-Client/ Work Product |
| 08/02/13 | Email from Ronda Girardeau to David Johnson and Jean Tucker cc: to John Steadman regarding El-Saba's request for leave; | Attorney-Client |
| 10/24/11 | Email from John Steadman to Kristin Daniels regarding Alsharif and Russ tenure and promotion; | Attorney-Client/ Work Product |
| Undated | Attorney's notes regarding Alsharif and Russ tenure and promotion; | Work Product |
| Late March 2012 | Attorney Notes (Jean Tucker) regarding El-Saba; | Work Product |
| 03/05/07 | Email from Adel Sakla to Jean Tucker regarding faculty search (see USA 004122); | Attorney-Client |
| 03/05/07 | Email from Jean Tucker to Adel Sakla, copying John Steadman and Kelley Lynd regarding faculty search (see USA 004121); | Attorney-Client |
| 03/06/07 | Email from John Steadman to Adel Sakla, copying Jean Tucker and Kelley Lynd regarding faculty search (partial redaction only, see USA 004120); | Attorney-Client |

| DATE | DESCRIPTION | PRIVILEGE |
|---|---|---|
| 03/13/07 | Email from Pat Covey to Sankoorikal Varghese copying Keith Harrison regarding faculty search (partial redaction only, *see* USA 004198); | Attorney-Client |
| 03/14/07 | Email from John Steadman to Keith Harrison regarding faculty search (partial redaction only, *see* USA 004199); | Attorney-Client |
| 08/19/13 | Email from Kristin Daniels to Jean Tucker regarding El-Saba leave; | Work Product/ Attorney-Client |
| 08/19/13 | Email from Jean Tucker to Kristin Daniels and Windy Bitzer regarding El-Saba leave; | Work Product/ Attorney-Client |
| 08/19/13 | Email from Windy Bitzer to Jean Tucker and Kristin Daniels regarding El-Saba leave; | Work Product/ Attorney-Client |
| 08/19/13 | Email from Jean Tucker to John Smith, David Johnson, John Steadman and copying Kristin Daniels regarding El-Saba leave; | Work Product/ Attorney-Client |
| 08/19/13 | Email from John Steadman to Jean Tucker, David Johnson, John Smith and copying Kristin Daniels regarding El-Saba leave; | Work Product/ Attorney-Client |
| 08/20/13 | Email from David Johnson to John Steadman and copying Jean Tucker, John Smith and Kristin Daniels regarding El-Saba leave. | Work Product/ Attorney-Client |

Respectfully submitted,

/s/ *Christine Harding Hart*
WINDY C. BITZER (BITZ7315)
CHRISTINE HARDING HART
(HARTC5687)
HAND ARENDALL LLC
Post Office Box 123
Mobile, Alabama 36601
(251) 432-5511
*Attorneys for Defendant*
*University of South Alabama*



1

2

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

4   AED EL-SABA,                    *                    **ORIGINAL**
                                    *
5        Plaintiff,                 *
                                    *
6   V.                              *        CIVIL ACTION NUMBER:
                                    *        1:15-CV-00087-KD-N
7   UNIVERSITY OF SOUTH             *
    ALABAMA,                        *
8                                   *
    Defendant.                      *

9

10

11

12

13

14          The deposition of MOHAMMAD ALAM, Ph.D.,

15   taken on Thursday, the 14th day of July 2016, at the

16   University of South Alabama, Whiddon Administration

17   Building, 307 University Boulevard North, Mobile, AL

18   36609, commencing at 9:15 A.M.

19

20

21

22

23

1    BY MR. WILSON:

2        Q.   And are you currently the chairman?

3        A.   No, I'm not.

4        Q.   When did your chairmanship cease?

5        A.   Return to faculty on August 15th, 2015.

6        Q.   So is it fair to say you were the chair for

7    14 years?

8        A.   Slightly over 14 years.

9        Q.   How old were you when you assumed the

10   chairmanship?

11       A.   I was born in June 1961.  So when I became

12   the chairman I was --

13       Q.   -- forty.

14       A.   -- forty.

15       Q.   And why did your chairmanship end, please?

16       A.   What's that?

17       Q.   Why did your chairmanship end, please?

18       A.   I decided to return to the faculty status.

19       Q.   And why was that, please?

20       A.   I prefer not to answer that question.

21       Q.   Is that because you are afraid of opening up

22   areas for which you might be retaliated against?

23           MRS. BITZER:   No --

1      A.   No.   That's my -- I prefer not to answer.

2    BY MR. WILSON:

3      Q.   Generally, that answer is not sufficient.

4    So I'm inquiring --

5      A.   I will say, I returned to the faculty on

6    August 15, 2015.

7      Q.   Did you suffer a diminution in salary?

8      A.   Again, I said I'd limit my answers to the

9    case pertaining to Dr. El-Saba.

10     Q.   So in other words, I'm asking you if you

11   suffered a reduction in salary, and you're declining

12   to answer; is that correct?

13     A.   I'll not answer that question.   I prefer not

14   to answer that question.

15     Q.   Okay.   Are you currently seeking employment

16   elsewhere?

17     A.   Yes.

18     Q.   Okay.   What is the process in looking for

19   another job?   Are you looking for a job in academia

20   or private industry or both?

21     A.   Mainly academia, senior academic position.

22     Q.   Does that search depend upon references from

23   this University?

1      A.   No.  I kept it general.

2      Q.   So the answer is:  As far as you recall, you

3  did not identify faculty members?

4      A.   I said faculty concerns.

5      Q.   Okay.  Did Dr. -- Did Dean Steadman ask you

6  who, by name, are these people that are raising the

7  concerns?

8      A.   I don't recall him asking that question.

9      Q.   Okay.  Did you have the impression from

10  those discussions with Dean Steadman that he knew

11  that Dr. El-Saba was one of the critics?

12      A.   Well, Dr. El-Saba, as I said, was open.

13      Q.   Right.

14      A.   So in general, if you're a department chair

15  or a Dean would have that information in one way or

16  the other.

17      Q.   All right.

18      A.   Because he was open, I'm pretty sure the

19  Dean probably heard it.  For example, the

20  no-confidence vote, he said the Dean knew.

21      Q.   How do you know -- Well, the Dean was

22  excused from the no-confidence vote, correct?

23      A.   Yes.

1      Q.   Did it come to you?  Even though you didn't

2   actively acquire it, did anything come to you?

3      A.   There were a lot of discussions here and

4   there, but I don't know what was the center of those

5   issues.

6      Q.   Was one of those discussions the Dean left

7   under less-than-fully-favorable terms?

8      A.   I'm not privy to that information.

9      Q.   Did you hear rumors on that information?

10     A.   Well, I'll not comment on rumors.

11     Q.   Okay.  Did your conversation with Dean

12   Steadman in which you referred to the salary chart

13   also include a discussion about who was driving the

14   no-confidence vote?

15     A.   I don't recall having that discussion with

16   him.

17     Q.   But as far as you recall, the no-confidence

18   vote did come up in your discussion with him about

19   the salary chart; is that correct?

20        MRS. BITZER:  Object to form.

21   BY MR. WILSON:

22     Q.   You may answer the question.

23     A.   I need to understand your question.

1    the no-confidence vote?

2         A.  I didn't mention it.  He asked --

3         Q.  Did he ask you about Dr. El-Saba's

4    participation?

5         A.  As I said, he asked me why I didn't say

6    anything.  And I said that I decided to keep quiet

7    because it happened very suddenly, and it was

8    awkward for me.  And I didn't say anything in favor

9    of faculty or in favor of the Dean.  I decided to

10   keep quiet.

11        Q.  Did Dean Steadman, in your opinion, tend to

12   hold El-Saba accountable to some extent for the

13   no-confidence vote?

14            MRS. BITZER:  Object to the form.  It's a

15        lack of foundation and calls for speculation.

16   BY MR. WILSON:

17        Q.  Sir, you may answer that question.

18        A.  I prefer not to answer that question.

19        Q.  I'm going to try to respect your preference

20   not to answer some questions, but I can tell you

21   that that's a little irregular.  Let me ask you,

22   have you had advice from counsel to give that answer

23   "I prefer not to answer that question"?  Has counsel

**Mohammad Alam, Ph.D.**                                                          **86**

```
 1        in evidence.  So I object to the form of the

 2        question.

 3   BY MR. WILSON:

 4        Q.  Subject to the objection, are you aware?

 5            MRS. BITZER:  I think you should rephrase.

 6            MR. WILSON:  I think he can answer.

 7        A.  I didn't understand.

 8   BY MR. WILSON:

 9        Q.  Okay.  Are you aware that Dr. El-Saba

10   participated in several EEOC investigations into the

11   University of South Alabama?

12        A.  I think he participated probably one.

13        Q.  Okay.

14        A.  But he did, I think so.

15        Q.  Do you know whether Dean Steadman knew of

16   Dr. El-Saba's participation?

17        A.  I don't know.  You'd have to ask

18   Dr. Steadman about it.

19        Q.  Do you know if Professor Johnson knew of

20   Dr. El-Saba's participation?

21        A.  I don't know.

22            MRS. BITZER:  Dr. Johnson.

23            MR. WILSON:  Dr. Johnson, that's who I
```

1       Q.   Okay.  Had your recommendation been for the

2    entire semester rather than intermittent leave?

3       A.   I believe it was for the entire semester.

4    But I say that I'm not 100 percent sure.  But as far

5    as I recall, it was for the semester.

6       Q.   Okay.  Did you agree with the Dean's

7    ultimate suggestion that it be intermittent?

8          MRS. BITZER:  Object to form.  You just said

9       it was the Dean's suggestion.  I don't think

10      that's been established.

11   BY MR. WILSON:

12      Q.   Did the Dean suggest it be intermittent?

13      A.   Well, after that then, we had discussions

14   with the Dean.  I think also Dr. El-Saba was also

15   involved.

16      Q.   Okay.

17      A.   Again, I'm trying to recollect from memory.

18   And then it went to the intermittent family medical

19   leave.

20      Q.   What was the Dean's recommendation;

21   intermittent or the entire semester?

22      A.   As far as I recall, intermittent.

23      Q.   Did you agree or disagree with that?

Mohammad Alam, Ph.D.

98

1    A.   I don't have to agree with it because once I

2    give my recommendation, then it's up to the Dean.

3    The Dean can agree with me, and he can override my

4    recommendations also.   It's up to the Dean.

5    Q.   All right.   Did you discuss the intermittent

6    recommendation of the Dean with him?

7    A.   As I said, after the application went to the

8    Dean and we had discussed, he said the entire

9    semester is not needed.   So it has to be, like,

10   three or four days for first procedure, then two

11   days not included in the lip, something like that.

12   And Human Resources also got involved with it.

13   Q.   Did you disagree with the intermittent

14   recommendation?

15   A.   I'll not comment on it because I already

16   made my recommendation.   It's up to the Dean.

17   Q.   After the dental leave was approved, did you

18   discuss its terms with Doctor El-Saba?

19   A.   The terms were discussed, I think, in a

20   meeting involving Dr. El-Saba, myself, and the Dean.

21   And then me and El-Saba, we had to discuss what

22   would be his activity given the semester.   Because

23   it was, like, let's say in the week, three-day

1    family intermittent leave, two days work schedule.

2    So Dr. El-Saba was supposed to do a few things,

3    especially in terms of research and supervising

4    students and things like that.  And then I informed

5    the Dean about that arrangement.

6        Q.  Did Dr. El-Saba complain to you that the

7    intermittent leave was harsh?

8        A.  He did say that.  I think he mentioned it to

9    the Dean also.

10       Q.  All right.  Did you agree with him that it

11   was harsh?

12       A.  As I said, my recommendation was for the

13   entire semester.  And then after that, I'm done.

14       Q.  Right.  But did you agree with Dr. El-Saba

15   that the -- that it was harsh?

16       A.  I prefer not to comment on it.

17       Q.  Do you recall giving Dr. El-Saba an

18   evaluation for the 2008/2009 academic year when he

19   took his dental leave?

20       A.  Well, as chair, I have to evaluate every

21   faculty member at the end of the academic year, and

22   that includes Dr. El-Saba.

23       Q.  Were there any questions on -- with

1    leave and will not waste his time.

2        Q.   Okay.  Did the Dean make a remark to the

3    effect that he would make it difficult, so difficult

4    on Dr. El-Saba that he would be forced to quit?

5        A.   I don't recall that statement.

6        Q.   All right.  Now, you're telling me that you

7    don't recall it.  Now, is it that you don't recall

8    the precise words I'm using to describe it?

9        A.   Well, whatever I remember, I told you.

10       Q.   Okay.  So you don't remember anything about

11   Dean Steadman's making a remark that he would make

12   it so tough, so rough, or so hard on Dr. El-Saba

13   that he would quit; is that your testimony?

14       A.   I don't remember that.

15       Q.   Don't remember.  If Dr. El-Saba says that

16   you, in fact, reported that to him after this

17   meeting, would you be prepared to say that you have

18   enough of a recollection of your meeting with this

19   man, Dean Steadman, to say that Dr. El-Saba is

20   wrong?

21       A.   I don't remember that statement.

22       Q.   So then you're not able to contradict

23   Dr. El-Saba, are you?

1       A.   Contradict means?

2       Q.   Are you able to tell us, as you sit here

3   today, that Dr. El-Saba's recollection of your

4   statement, of your report about your meeting with

5   Dean Steadman is wrong?  Are you able to say --

6       A.   I don't recall what Dr. El-Saba said during

7   that discussion with the Dean.  All I am saying,

8   there were many conversations took place over a 12,

9   13-year period.  I don't remember each and every

10  conversation.

11      Q.   Well, did you have a conversation with

12  Dr. El-Saba after you met with Dean Steadman?

13      A.   I met or I talked to Dr. El-Saba on many

14  occasions.  But right after that meeting, I don't

15  remember whether I had it or not.

16      Q.   Do you remember if you ever discussed with

17  Dr. El-Saba your discussion with Dean Steadman in

18  which he said he's not happy and that he hopes he

19  finds some other place to work?

20          MRS. BITZER:  Object to form.  It's a

21      mischaracterization of the words that Dr. Alam

22      just used.  But the record will reflect what he

23      just said.

1    BY MR. WILSON:

2        Q.  Would you answer the question, please?  You

3    may answer, sir.

4        A.  What is the question, please?

5            MRS. BITZER:  I think he should repeat the

6        question if you don't understand it or recall

7        it.

8    BY MR. WILSON:

9        Q.  Sir, did you ever have a conversation with

10   Dr. El-Saba about the conversation with Dean

11   Steadman that you just described, in which he said

12   that Dr. El-Saba was not happy, et cetera, et

13   cetera, did you ever have a conversation with Dr.

14   El-Saba about that?

15       A.  I don't recollect that.  But in general, my

16   job as department chair is to encourage each and

17   every faculty to perform in teaching, research, and

18   service.  And I encourage all them to pursue things

19   like that, but I don't remember this specific

20   conversation.

21       Q.  Are you denying that it happened?

22       A.  I said I don't remember.

23       Q.  Okay.  So you're not denying that it

Mohammad Alam, Ph.D.

1   happened, correct?

2      A.   I gave my answer.

3      Q.   Okay.  Did Dean Steadman give you any

4   explanation why he hoped that Dr. El-Saba would find

5   another opportunity?

6      A.   That, I didn't discuss with him.

7      Q.   All right.  Do you recall ever telling

8   Dr. El-Saba that Dean Steadman would make it so

9   tough, so rough, or so hard, or words to that

10  effect, that he hoped Dr. El-Saba would leave?

11     A.   Well, I think that's the same questions you

12  asked before, right?

13     Q.   Yes, sir.  But I'm restating the question

14  more broadly now.  Ever?

15     A.   I don't remember that.

16     Q.   Okay.  Now, as we sit here today, you are

17  applying for other employment, correct?

18     A.   Yes.

19     Q.   And to get that senior administrative

20  position, you would expect that Dean Steadman would

21  be contacted, correct?

22     A.   He's one of my references.  Dr. Johnson is.

23  And actually, as I said, when you apply for the

Mohammad Alam, Ph.D.                                    **109**

```
1          Q.   Let me go back to the recommendation for

2    intermittent dental leave in 2008.   Do you recall

3    any other ECE faculty department person making such

4    an application?

5          A.   For dental leave?

6          Q.   For intermittent leave.

7          A.   I don't believe any other faculty member

8    applied for intermittent.

9          Q.   Okay.   When the Dean made his remark that

10   El-Saba was not happy, did he also make a remark

11   about his wasting money, or did he also make a

12   remark about his hiring an attorney?

13         A.   Wasting money part I don't remember; but

14   wasting time, as I mentioned.

15         Q.   Okay.   So at this occasion when the Dean

16   made the remark that Dr. El-Saba was not happy, he

17   also made the remark that it would be a waste of

18   Dr. El-Saba's time to hire an attorney?

19         A.   No, no.   The attorney was not referred.

20         Q.   Okay.   How did the wasting time remark come

21   up?

22         A.   Well, wasting time means probably, my

23   understanding -- again, it is my own view -- that if
```

1    he finds something better outside, maybe he will be

2    happy.  That's the way I understood it.

3        Q.  So you understood his wasting time remark as

4    pertaining to Dr. El-Saba's wasting his time by

5    continuing to serve at the University of South

6    Alabama; is that correct?

7        A.  I will probably not comment on it.  Because

8    it's his comment and not of people's interpretation.

9    I'm not going to make a comment.

10       Q.  Okay.  So you have an interpretation, but

11   you're not going to discuss it; is that correct?

12       A.  Well, I prefer not to make a comment.

13   Because my comment may be right, may be wrong, so I

14   prefer not to make a comment.

15       Q.  All right.  Just for the record, I want you

16   to be very clear about this, that I'm going to

17   reserve all my rights to raise your refusal to

18   testify at various points with the Magistrate, and I

19   may seek an order compelling you to testify.  I want

20   you to understand that.  Do you understand that,

21   sir?

22       A.  What is that?

23       Q.  You can say yes or no, sir.  Do you

**Mohammad Alam, Ph.D.**                                      118

1        A.  When I was the lead, I put him as a Co-PI

2    because some of his background was very helpful for

3    those projects.

4        Q.  Do you remember any significant research

5    that he did after those projects?

6        A.  After that, I really think he slowed down

7    quite a bit.  I tried to encourage him, but I think

8    his effort was not up to the previous level.

9        Q.  Did you discuss that with him?

10       A.  Yes.  I discussed it with every faculty

11   during the annual faculty reviews.  Sometimes I

12   mentioned them when I saw them in the corridor or

13   so.

14       Q.  Did he agree with you?

15       A.  Agree with me in what sense?

16       Q.  Did he agree with you that his research

17   activity had slowed down?

18       A.  Well, I told him that, and El-Saba felt yes.

19       Q.  All right.  Did he tell you why?

20       A.  I don't remember exactly what he said or

21   what he did not say.  My job was to encourage each

22   and every faculty member to do outstanding job in

23   teaching, excellence in research and excellence in

1    service.

2        Q.   So did he agree with you that he slowed

3    down?

4        A.   Well, I told him during the evaluation and

5    other occasion that his research had slowed down.

6    And anything I can help, I do that.   My labs are

7    available to him.

8        Q.   Did he agree that he slowed down?

9        A.   I don't remember whether he agreed or

10   disagreed.   My job is to convey what I felt.

11       Q.   Did you ever tell him that he was the

12   sharpest in the department, especially when it comes

13   to research?

14       A.   I don't recall making that statement.

15       Q.   Would you deny that you made it?

16       A.   I said I don't remember, so...

17       Q.   Okay.   All right.

18       A.   But as I said, initially his research was

19   fine.

20       Q.   Do you recall a JWATH program?

21       A.   Yes.

22       Q.   Did that pre or postdate the Army and space

23   missile projects?

1     A.  No, he did not.

2     Q.  Did the Dean ever indicate to you that he

3 was having students watch Dr. El-Saba?

4     A.  I don't remember anything like that.

5     Q.  Did you ever tell Dr. El-Saba that the Dean

6 was having students watch him particularly?

7     A.  I don't remember that.

8     Q.  Let me go back to the JWATH program.  Was

9 that program eventually cancelled?

10     A.  It stopped.

11     Q.  And why was that, please?

12     A.  Okay.  So when I took over, there was

13 basically no research in the department.  So one of

14 the responsibility that was given to me by the Dean

15 who hired me was to expand funded research program.

16 And the most successful program was established with

17 the company called "Radiance Tech."  So we got,

18 like, 4.5 million dollars from the Department of

19 Energy.  There were $3,000,000 from SMDC, but that

20 money was split, and then another big project from

21 NASA.

22          So with respect to the JWATH project funded

23 by the SMDC, four people are involved from the

1    with a meeting between you, Steadman, and

2    Dr. El-Saba about the research -- Excellence in

3    Research Award?

4             MRS. BITZER:  Object to the form.

5             MR. WILSON:  What's the objection?

6             MRS. BITZER:  I didn't understand the

7         question.  I'm sorry.

8             MR. WILSON:  I don't think it's bad form.

9    BY MR. WILSON:

10        Q.  But did you understand it, sir?

11            MRS. BITZER:  If he understood it.

12        A.  If you can, restate it.

13   BY MR. WILSON:

14        Q.  Do you recall any usage by Dr. El-Saba of a

15   phrase like "revenge of me" or the word "revenge"

16   during a conversation that you, he, and Dr. Steadman

17   had about the 2010 Research in Excellence Award?

18        A.  I don't remember.  But the meeting was

19   tense.  There was tense conversation between

20   Dr. El-Saba and the Dean.

21        Q.  How long did that meeting last?

22        A.  My guess, pure guess, maybe half an hour.

23        Q.  Okay.  Can you remember anything that

1    attached to Exhibit Number 6, did you form any

2    opinion about his return date in reading that

3    Exhibit?

4        A.   But I saw this before, not last week.

5        Q.   When you first saw it?

6        A.   First means when I saw it first time?

7        Q.   Yes, sir.

8        A.   At that time, I would say I didn't basically

9    get involved with it at all.  I just stayed on the

10   sidelines.  Dr. Steadman and Dr. Johnson basically

11   handled it.

12       Q.   Okay.  Did you discuss either the medical

13   documentation attached as Exhibit Number 5 or Number

14   6 with Dean Steadman?

15       A.   Dr. Steadman, no, I didn't discuss that.

16   Because he already have everything in the email.

17       Q.   Did you ever advise Dr. El-Saba that you had

18   discussed the medical exhibits with Dean Steadman?

19       A.   The first one, yes.

20       Q.   Okay.  What about Exhibits 5 and 6, did you

21   ever advise Dr. El-Saba that you had discussed

22   Exhibits 5 and 6 with Dean Steadman?

23       MRS. BITZER:   The second and third medical

**Mohammad Alam, Ph.D.**

1       documents that were attached as exhibits.

2       A.  I don't recall having this kind of

3   conversation with Dr. El-Saba.  But the first time

4   when I submitted that request, Dr. Steadman

5   requested meeting, and I discussed it with him.

6   Subsequently, it was taken over by the Dean and

7   Dr. Johnson.  At that point, my recommendation went

8   out, and I was not there.

9   BY MR. WILSON:

10      Q.  At the time that Dr. El-Saba was applying

11  for leave, he had been out the entire year before,

12  correct?

13      A.  I think so.

14      Q.  And who, by name, if anyone, had taught his

15  courses?

16      A.  As far as I recall, we had temporary

17  faculty.  Temporary means they don't have

18  tenured-track appointment, and they covered those

19  classes.

20      Q.  And I asked you who, by name, took over

21  those classes?

22      A.  I can't recall, by name, without looking at

23  the records.  I don't recall who took over those