**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| AED EL-SABA, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 15-0087-KD-N |
| | ) | |
| UNIVERSITY OF SOUTH ALABAMA, | ) | |
|     Defendant. | ) | |

## ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment and Supporting Brief (Doc. 65), Plaintiff's Response to Motion for Summary Judgment (Doc. 77), Defendant's Summary Judgment Reply Brief (Doc. 86), Plaintiff's Supplemental Response (Doc. 90-2), Defendant's Reply to Plaintiff's Supplemental Response (Doc. 94-1), Defendant's Evidentiary Objections to Plaintiff's Summary Judgment Response and Declaration (Doc. 87), and Plaintiff's Opposition to Defendant's Evidentiary Objections (Doc. 89). The Court finds that Defendant's Objections to Plaintiff's Summary Judgment Response and Declaration are **SUSTAINED in part, OVERRULED in part**, and **MOOT in part**, as set forth herein. Upon consideration of the parties' briefs, all evidentiary materials submitted, and the relevant law, the Court finds that Defendant's Motion for Summary Judgment is due to be **GRANTED.**

## I.  Introduction

Plaintiff Aed El-Saba, who was born in Lebanon and became a naturalized United States citizen in 1991, was employed as a professor in the Electrical and Computer Engineering Department ("ECE") at the University of South Alabama ("USA") from 1999 until August 20, 2013. (Doc. 1 at 1; Doc. 66-1 at 29, 293). Plaintiff filed a

complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that

his termination[1] was due to illegal discrimination; he received notice of a right to sue

from the EEOC on November 24, 2014. (Doc. 1 at 1). He filed the complaint in this

action on February 18, 2015, asserting that USA terminated his employment for a

discriminatory reason, his national origin, in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, and in retaliation for his ongoing

complaints that the Dean of Engineering discriminated based on national origin. (Doc. 1).

Defendant filed its Motion for Summary Judgment on August 17, 2016 seeking judgment

in its favor on the ground that Plaintiff has not submitted sufficient evidence that his

termination was based on his national origin or in retaliation for any protected activity.

(Doc. 65).

## II.  Evidentiary Objections

Per Rule 56(c)(2) of *The Federal Rules of Civil Procedure*, "[a] party may object

that the material cited to support or dispute a fact cannot be presented in a form that

would be admissible in evidence."  The Advisory Committee Notes specify that "[t]he

burden is on the **proponent** to show that the material is admissible as presented or **to**

**explain the admissible form that is anticipated**." Fed. R. Civ. P. 56, *Adv. Comm. Notes*,

"Subdivision(c)" (2010 Amendments) (emphasis added); *accord Wilkinson v. Carnival*

*Cruise Lines, Inc.*, 920 F.2d 1560, 1566-67 (11th Cir. 1991)(holding that it was reversible

error for District Court to admit employee's testimony under Rule 801(d)(2)(D) where

---

[1] Although Plaintiff was technically deemed to have resigned when he did not return to work after his leave expired, Plaintiff at times refers to the end of his employment with USA as being fired or terminated. Thus, when the court uses the term "termination," it is referring to the denial of Plaintiff's request for an extension of his leave, which resulted in him being deemed to have resigned.

"plaintiff has offered not one whit of evidence … to lay a predicate for the admissibility of the statement"). As grounds for its objections, Defendant contends that certain portions of the evidence relied upon by Plaintiff in opposing summary judgment contains inadmissible hearsay or is otherwise inadmissible. (Doc. 87).

### A. Plaintiff's Declaration

Defendant objects to several statements set forth in Plaintiff's Declaration. (Doc. 79-4 at 10-16). Defendant objects to Plaintiff's testimony about what others knew about the components of raises, as set forth in Doc. 79-4 at 10, ¶ 2, on the grounds that such testimony is not based on Plaintiff's personal knowledge, is hearsay and/or is speculative. Plaintiff agrees that such testimony is not admissible because he does not identify the declarants. This objection is **SUSTAINED**.

Defendant objects to ¶ 5 of the Declaration as hearsay. In ¶ 5, Plaintiff states that, by October of 2006, he (El-Saba) was aware that Dr. Steadman, the Dean of USA's College of Engineering, had stated during an ECE faculty search committee meeting that he (Dr. Steadman) was going to change the demographics of the ECE department. (Doc. 79-4 at 10, ¶ 5). Plaintiff admits that he never personally heard Steadman make such a remark. (Doc. 66-1 at 29-30). However, Dr. Rahman, another faculty member, testified that he heard Dr. Steadman make the statement. (Doc. 79-5 at 10). Thus, the statement would be admissible through the testimony of Rahman. The objection to ¶ 5 is **OVERRULED**.

Defendant also objects to Plaintiff's and any other witness's explanation or characterization of Steadman's demographic statement without designating specific

testimony. Because the Court has not considered any such evidence, this objection is **MOOT**.

Paragraphs 8 and 9 describe conversations El-Saba had with a fellow faculty member, Dr. Byrne, about another faculty member, Dr. Brothers. (Doc. 79-4 at 10-11, ¶¶ 8, 9). Defendant points out that Byrne's deposition testimony differed from Plaintiff's recollection and argues that the evidence is hearsay that cannot be reduced to admissible form at trial. In response, Plaintiff simply argues that "[i]t is a statement by an opposing party and admissible." (Doc. 89 at 2).

Rule 801(d)(2)(D) of the *Federal Rules of Evidence* provides that a statement is not hearsay if it "is offered against an opposing party and … was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." As set forth above, "[t]he burden is on the ***proponent*** … ***to explain the admissible form that is anticipated.***" Although Plaintiff states that Byrne is "an opposing party" and the record shows that Byrne was a fellow faculty member in the ECE department, Plaintiff has not asserted that, or described how, Byrne's alleged statements to Plaintiff were made in the scope of his employment with Defendant.  *See Wilkinson*, 920 F.2d at 1566-67; *Riley v. Univ. of Ala. Health Servs. Found.*, 990 F. Supp. 2d 1177, 1191 (N.D. Ala. 2014) (objection sustained where plaintiff did not establish that the statement concerned "a matter within the scope of [declarant's] relationship" with the defendant). Nonetheless, it appears that Byrne's statements were made in his capacity as chairman of the search committee and as such may be admissible.  The objection is **OVERRULED**.

Paragraphs 10 and 11 contain Plaintiff's statements about what Dr. Alam, the chair of the ECE department, and Dr. Adams, another faculty member, told him about

incentives and salary offered and/or paid to Adams. (Doc. 79-4 at 11, ¶¶ 10, 11). Plaintiff argues that these statements should be admitted pursuant to Rule 801(d)(2)(D); however, he does not show how these statements were made to him within the scope of the declarants' employment.  It appears that Alam was speaking in his capacity as the chair of the ECE department, and thus, his statement appears to be admissible.  However, there is no evident basis to admit Adams's statements.  Moreover, Plaintiff's argument that Rule 803(3) supports the admission of Adams's testimony because it reveals his state of mind also fails because Adams's state of mind is not relevant to this case. Defendant's objection to ¶10 is **OVERRULED**, and its objection to ¶ 11 is  **SUSTAINED**.

Defendant argues that Plaintiff's statements in ¶ 17 of his Declaration concerning Alam's discussion with Plaintiff of Steadman's directive concerning the dates to include in his evaluation constitute double hearsay. (Doc. 79-4 at 12, ¶ 17). However, the record supports a finding that both Alam's and Steadman's statements were made within the scope of their employment with Defendant in connection with Plaintiff's employment evaluation. Because the evidence is apparent from the record, the Court will take note of and consider the evidence.[2] As to the statements in ¶ 17 of the Declaration, Defendant's objection is **OVERRULED**.

---

[2] This is but one instance of Plaintiff's repeated failure to properly support, either factually or legally, his position or argument. Plaintiff's filings have been woefully insufficient in this regard. The part of adversary is to be played by the parties and their counsel, not the Court.

### B.  Other Evidence

Defendant objects to "statements made by any non-party reflected in the meeting minutes" contained in Plaintiff's Exhibits C and D. (Doc. 79-8; Doc. 79-9). Defendant does not specify the statements to which it objects. These exhibits consist of minutes of the ECE department faculty meetings and the ECE faculty search committee meetings. Minutes are obviously based on statements made by the attendees. From what the Court can glean, all participants at these meetings were employed by Defendant and, presumably, anything that was recorded would have been stated by them within the course of their employment. Because of the vagueness and lack of specificity of the objection, the fact that some of the statements would appear to fall within exceptions to the hearsay rule, and the indicia of trustworthiness attendant to minutes that are subsequently approved by vote of the committee members, the objection to Exhibits C and D is **OVERRULED.**

Defendant objects to the statement by Byrne, the chair of the ECE faculty search committee, that Alam told him that Steadman stated that he preferred that the search committee consider native-born, natural English-speaking applicants. (Doc. 79-2 at 7-8). Defendant claims that this statement is double hearsay. Plaintiff argues that this statement is non-hearsay pursuant to 801(d)(2)(D).  As noted above, Plaintiff proffers no evidence concerning whether this statement was made within the scope of employment.  However, the record shows that both Alam's and Steadman's statements, although disputed by Steadman, would have been made within the scope of their employment with Defendant, specifically with regard to their roles in faculty searches. Defendant's objection to Byrne's testimony is **OVERRULED**.

Defendant objects to "Khan's testimony regarding what Russ said." Because no such testimony has been located by the Court, this objection is **MOOT.**

Defendant objects to Plaintiff's testimony that Alam told him that Steadman said he would make it so hard or tough on Plaintiff that he would have to resign. (Doc. 66-1 at 102-03). Alam allegedly told Plaintiff this when Plaintiff came to his office to again express his dismay at not being awarded the Excellence in Research award. (Doc. 66-1 at 103). Defendant argues that Steadman's alleged statement is not admissible because Alam testified that he does not recall Steadman making the statement or telling Plaintiff that Steadman made the statement. (Doc. 66-4 at 28-29). However, whether the statement was made goes to credibility, not admissibility.  The circumstances of Plaintiff's discussion with Alam, i.e., to discuss a department award, would support that Alam repeated Dr. Steadman's statement in his capacity as chair of the ECE department. The objection is **OVERRULED.**

Defendant objects to the Declaration of Dr. Sakla, an associate professor in the ECE department, in which he states that Alam told him on two occasions that Steadman "seemed to be after Dr. El-Saba and did not like him."  (Doc. 79-6 at 15). Plaintiff has made no showing that these statements were made within the scope of employment, as opposed to idle gossip, and there is nothing in the record to support a finding that these statements were made within the scope of Alam's employment; therefore, these statements are inadmissible hearsay. Defendant's objection to Sakla's Declaration is **SUSTAINED.**

Defendant objects to Plaintiff's testimony about what he "learned" that Steadman had said to Alam about his 2012 leave request as hearsay. (Doc. 79-3 at 31). The Court has not relied on what Plaintiff "learned" so the objection is **MOOT**.

Defendant objects to Plaintiff's testimony about his conversations with Alam concerning his 2013 leave request. (Doc. 66-1 at 168-69). Alam, as chair of the ECE department, was the person to whom Plaintiff was supposed to submit his leave request. Therefore, it appears that Plaintiff's conversation with Alam about the request would be non-hearsay pursuant to 801(d)(2)(D). Defendant's objection is **OVERRULED**.

Defendant objects to Plaintiff's testimony regarding what Alam told him about discussions Alam had with Steadman concerning the August 13 and 14 medical letters. (Doc. 79-4 at 7-8). As both Alam and Steadman were discussing Plaintiff's employment, the statements would appear to be non-hearsay. The objection is **OVERRULED.**

### III. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) provides as follows:

*(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

> **(3) Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.
>
> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. Rule 56(c).

Defendant, as the party seeking summary judgment, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323.  In assessing whether the nonmoving party has met its burden, "the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter….Instead, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992).

The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). Likewise, conclusory allegations are insufficient to create a genuine issue of material fact and, therefore, do not suffice to defeat a motion for summary judgment. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997)("conclusory assertions…, in the absence

of [admissible] supporting evidence, are insufficient to withstand summary judgment").

"After the nonmoving party has responded to the motion for summary judgment, the

court must grant summary judgment if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law." *AGSouth Genetics, LLC v.*

*Cunningham*, No. CA 09-745-C, 2011 WL 1833016, at *2 (S.D. Ala. May 13, 2011).

## IV.  Facts

The relevant facts, taken in the light most favorable to Plaintiff, show as follows:

Plaintiff was born in Lebanon, came to the United States in 1980 to attend

college, and became a naturalized citizen of the United States in 1991. (Doc. 66-1 at 3-5).

Plaintiff was hired by The University of South Alabama ("USA") in 1999 as a tenure-

track assistant professor in the Electrical and Computer Engineering department ("ECE").

(Doc. 66-1 at 6).  Plaintiff was terminated in August 2013 after his request for an

extension of leave was denied. (Doc. 66-1 at 293).

Plaintiff believes that Steadman discriminated against him based on the fact that

he is from the Middle East, when Steadman failed to extend his sick leave (resulting in

termination).  (Doc. 66-1 at 21-22). Plaintiff further complains that Steadman retaliated

against him because he spoke out against Steadman's national origin bias. (Doc. 66-1 at

22).  Plaintiff admits that Dr. Steadman, the Dean of the College of Engineering, is the

only person at USA who he alleges discriminated or retaliated against him. (Doc. 66-1 at

18-19).  The alleged discrimination, which lasted approximately 8 years, affected raises,

evaluations, and awards, and was the source of informal internal complaints by Plaintiff.

The following recitation of facts includes a historical background of Plaintiff's

relationship with USA and Steadman.  Plaintiff relies on alleged instances (between

2005- 2010) of unfair treatment by Steadman to show that Steadman's decision in 2013 to not extend his leave (resulting in his termination) was the result of national origin bias. Plaintiff also relies on his complaints regarding Steadman (made 2007-2012) to show that the failure to extend his leave was retaliation for Plaintiff's criticism of Steadman.

The record indicates that throughout Plaintiff's employment he received pay raises each time raises were given to professors.  (Doc. 66-1 at 15-16). His salary was never decreased. (Doc. 66-1 at 15). Plaintiff was awarded tenure and promoted to associate professor in 2005. (Doc. 66-1 at 16).  Moreover, Steadman approved each of Plaintiff's raises (after 2003) and recommended him for tenure and promotion. (Doc. 66-1 at 15-16).

However, Plaintiff did not believe non-native professors were being treated equally to American-born professors.  In the spring of 2007, Plaintiff made a chart showing the salaries of professors in the Department of Engineering for the years 2003-2007. (Doc. 66-1 at 34, 207-08). He showed the chart to Dr. Mohammed Alam, the ECE department chair, and expressed his concern that his salary "was not up to speed," especially in comparison to an American-born professor who had been hired a year before him. (Doc. 66-4 at 21-22; Doc. 66-1 at 74). The American-born professor with whom Plaintiff compared himself was hired by USA in August of 1998 and was promoted and tenured in August of 2004, while Plaintiff was hired in August of 1999 and was promoted and tenured in August of 2005. (Doc. 66-9 at 2). In addition to the American born professor having more seniority than Plaintiff, this professor was given a raise in 2006 as part of a salary adjustment for his role as the Graduate Coordinator for the College. (Doc. 66-9 at 3). In 2005, 2006, and 2007, he, along with three other

professors in the ECE department (Alam, Khan, and Hamid), also qualified for and received a CUPA adjustment. (Doc. 66-9 at 3-4). Plaintiff did not meet the qualifications for this adjustment. (Doc. 66-9 at 4).

At a faculty meeting in or about May of 2007, Plaintiff distributed the chart and made an allegation that the raises given to professors from 2004 to 2006 were racist because native-born, natural-English speaking  professors received greater raises than non-native born professors. (Doc. 66-1 at 32-37). Steadman was not present at this meeting. (Doc. 66-1 at 34; Doc. 66-2 at 6). Plaintiff never spoke to Steadman about his salary or the discrepancies and discrimination he believed existed. (Doc. 66-1 at 39). However, after the meeting, Alam showed the document to Steadman and mentioned to him Plaintiff's contention that salaries were discriminatory. (Doc. 66-4 at 11-13).

On July 20, 2007, Steadman attended the ECE faculty meeting as a guest, and in response to concern expressed by Dr. Parker about the faculty raise discrepancies that had been discussed at the May meeting, explained that he strictly followed the University rules to recommend salary raises to the President. (Doc. 66-1 at 209).[3]

At an ECE faculty search committee meeting in 2007, Steadman said that he wanted to change the demographics of the ECE department. (Doc. 66-4 at 21; Doc. 66-6 at 3; Doc. 66-7 at 3). Steadman also stated he preferred "native-born, natural English-speakers." (Doc. 66-4 at 25-26; Doc.79-5 at 2).[4]

Steadman testified that, although he does not remember making the statements, any statement about changing the demographics would have referred to him encouraging

---

[3] USA states that the salary analysis was measurable, with very little left to discretion. (Doc. 66-9 at 4). Plaintiff has not offered any evidence to challenge this statement.
[4] Steadman does not recall making or denies making these statements. (Doc. 66-2 at 8-9).

the hiring of underrepresented minorities, specifically African Americans and women, in the engineering department as a whole. (Doc. 66-2 at 4, 8). Since at least 2005, most of the professors in the ECE department have been foreign born. (Doc. 66-6 at 4, 6; Doc. 66-15 at 6-13).

Plaintiff made complaints in or about 2008 at search committee meetings and ECE department meetings that Steadman's alleged statement that he wanted the ECE department to hire native-born, natural English-speaking professors was discriminatory. (Doc. 66-1 at 53-56). Steadman heard about some of Plaintiff's complaints. For example, after a faculty meeting was held, which Steadman did not attend, where Plaintiff was very vocal in calling Steadman a racist, Steadman asked Alam why he did not defend him and, specifically, asked why Plaintiff made those statements. (Doc. 66-4 at 15-16).

Plaintiff requested a leave of absence for the fall semester of 2008 to have several dental surgeries performed in Dubai. (Doc. 66-1 at 68). After meeting with Steadman, Alam, and HR representatives, Plaintiff was granted leave, but only from August 29, 2008 to October 21, 2008. (Doc. 66-1 at 69). When Plaintiff was evaluated for Fall 2008 semester, Steadman directed that the two weeks before his leave commenced, for which he was paid but had no specific duties, were to be included in his evaluation. (Doc. 79-4 at 12). This negatively affected his evaluation, and Plaintiff felt like that evaluation could affect any raise or promotion that he was due. (Doc. 66-1 at 84-85). However, USA had a salary freeze for the next three to four years and Plaintiff did not seek any further promotions, so the evaluation had no impact on either of those. (Doc. 66-1 at 85-86).

On April 23, 2010, Plaintiff had a meeting with Steadman and Alam concerning "cancellation" of the 2010 Excellence in Research Award in the College of Engineering.

(Doc. 66-1 at 93-95). Each year a committee made up of past winners and faculty members from each engineering department evaluates the portfolios of the nominees and recommends a winner of the award. (Doc. 66-11 at 2-3). In 2010, Plaintiff was the only nominee. (Doc. 66-3). After evaluating Plaintiff's portfolio, the committee thought he had a weak case, particularly in the areas of external research funding and publication, and decided unanimously to not recommend a winner for the award for 2010. (Doc. 66-11 at 3, 6; Doc. 66-12 at 3; Doc. 66-13 at 2-3). Steadman was not on the committee and had no input on the selection of recipients for the award. (Doc. 66-9 at 4; Doc. 66-11 at 2-4; Doc. 66-12 at 3; Doc. 66-13 at 2-3). Plaintiff, however, believed that Steadman was responsible for cancellation of the award because he was the only nominee, and he expressed that belief in the April meeting. (Doc. 66-1 at 97-98). Steadman would not tell him the number of nominees and stated that there would be no award for 2010 because the quality of the research did not come to the level to be recognized. (Doc. 66-1 at 96-99). Plaintiff got upset at the meeting and told Steadman that he thought Steadman cancelled the award to punish Plaintiff for his previous statements. (Doc. 66-1 at 99-100).

After Plaintiff left the meeting, Alam stayed. (Doc. 66-1 at 100). According to Alam, Steadman told him that it seemed like Plaintiff was not happy at USA and that he hoped he would find something else and leave and not waste his time. (Doc. 66-4 at 27-28). Alam told Plaintiff that Steadman said he was going to make it so hard on Plaintiff that he would resign. (Doc. 66-1 at 102-03).

In the fall of 2011, Plaintiff gave an interview to an EEOC investigator concerning a claim that had been filed by a colleague against USA. (Doc. 66-1 at 86-87, 89). In that interview, Plaintiff accused Steadman of racism based upon the "change the

demographics" statement, the native-born, natural-English speaker statement, alleged salary discrepancies in the ECE department, alleged raise discrepancies in the ECE department, and restrictions placed on hiring applicants with H1B visas. (Doc. 66-1 at 90-91). Plaintiff offers no evidence that Steadman knew he gave a statement to the EEOC investigator or that he knew the content of the statement.

Plaintiff also met with Dr. Russ Lea, the Vice-President of Research, in the fall of 2011, to discuss the issues he had with Steadman. (Doc. 66-1 at 105-107). In early 2012, Plaintiff met with Jean Tucker, USA's in-house attorney, concerning Steadman's actions, namely, the cancellation of the research award, the "changing the demographics" remark, his desire to hire native-born, natural-English speaking professors, and the rejection of applicants with H1B visas. (Doc. 66-1 at 110-11). Plaintiff presumes that Tucker told Steadman about the meeting because she told him that she represented the administration (Doc. 66-1 at 112-13), but he has no evidence that Steadman knew about either meeting.

Plaintiff was on full or partial leave for much of his final two years at USA. After communications with Alam and consultations between Steadman and Human Resources, Plaintiff was given intermittent FMLA leave for Fridays during the fall 2011 semester so that he could take his wife to chemotherapy treatments. (Doc. 66-1 at 125-131). Plaintiff's course load was reduced from three courses to two courses for that semester, and his salary was adjusted accordingly. (Doc. 66-1 at 125-28). Because of medical issues with his wife's health and his own due to a heart attack he suffered in November of 2011, Plaintiff requested a one-year leave of absence encompassing the fall of 2012 and spring of 2013 semesters. (Doc. 66-1 at 136-37). Steadman recommended approval of that request, and it was granted by USA. (Doc. 66-1 at 138, 252-53).

During a visit to the United Arab Emirates (UAE) in July of 2013, Plaintiff suffered a heart attack. (Doc. 66-1 at 161, 261). Plaintiff initially went to a physician who opined that open-heart surgery would be necessary and told Plaintiff that he should not fly to the United States. (Doc. 66-1 at 163, 262). Because he did not want open-heart surgery, Plaintiff sought a second opinion from a prominent doctor in Dubai. (Doc. 66-1 at 164). That doctor recommended placing six stents in the three blocked arteries in lieu of open-heart surgery; Plaintiff underwent that procedure in Dubai on July 16, 2013. (Doc. 66-1 at 165, 283). He was released from the hospital on July 18, 2013. (Doc. 66-1 at 283).

Plaintiff sent an email to Alam on July 22, 2013 telling him about the heart attack and that the doctor had said he would need open-heart surgery. (Doc. 66-1 at 257-60).[5] He also attached a request for an additional one-year unpaid leave of absence. (Doc. 66-1 at 260). After this email, Plaintiff had several phone conversations with Alam in which Alam told him that he was recommending that Plaintiff's request for leave be granted and that he would retain the temporary professor who had worked in the department the previous year to work again that fall. (Doc. 66-1 at 168-69). The temporary professor was Dr. Ravi Gollapalli, who is from India. (Doc. 66-1 at 168, 170; 66-4 at 44-45). Alam recommended that the request for leave be granted because of the "clear cut statement from the physician that [said] he needed open-heart surgery." (Doc. 66-4 at 37). Alam then turned Plaintiff's leave request over to Steadman. (Doc. 66-4 at 38).

---

[5] In this email to Alam, Plaintiff describes the heart attack, the initial hospital visit, and specifically, the recommendation for open-heart surgery. Although he mentions being referred to Dubai Hospital, he fails to mention that a stent procedure, in lieu of open-heart surgery, had already been done a week earlier than the date of the email and that Plaintiff had been released from Dubai Hospital four days earlier. (Doc. 66-1 at 257-58, 291-92).

On August 1, 2013, Steadman sent Plaintiff an email in which he stated that he had received Plaintiff's request for a one-year unpaid leave of absence, but due to staffing needs, could not approve that length of time. (Doc. 66-1 at 280). He also told Plaintiff that he needed to know within twenty-four hours whether Plaintiff would be returning by August 15, 2013. (Doc. 66-1 at 280). Plaintiff emailed Steadman the next day stating that he could not respond within twenty-four hours because he could not get "proper medical advice" until the following Monday. (Doc. 66-1 at 279-80). Steadman replied to Plaintiff that day, August 2, telling him that he was sorry to hear about his health issues, but that he had sent the previous message denying Plaintiff's request for leave after consultation with Academic Affairs and Human Resources. (Doc. 66-1 at 278). Steadman gave Plaintiff until August 5 to let him know whether he would be available for work on August 15. (Doc. 66-1 at 277).

On August 5, Plaintiff emailed Steadman stating that, although he was not restricted from traveling, he had doctor appointments set to monitor his performance and, therefore, could not return until after November 11, 2013. (Doc. 66-1 at 277). Because Steadman was away from August 3 to August 13, 2013, Dr. Johnson, the Senior Vice-President for Academic Affairs and ultimate decision-maker, began handling Plaintiff's request and responded to Plaintiff on August 6. (Doc. 66-1 at 276-78; Doc. 66-10 at 2 ). Johnson reiterated to Plaintiff that, because of staffing needs, USA could not grant his request for another one-year leave of absence. (Doc. 66-1 at 276). He also told Plaintiff that in order for USA to consider whether he could be granted a leave of absence for the fall semester, Plaintiff would need to provide a statement from his physician by August 12, 2013 stating that he would be able to return to work at USA on January 2, 2014.

(Doc. 66-1 at 276-77). On August 13, 2013, Plaintiff sent an email attaching a "Sick Leave Certificate" dated August 13, 2013, which stated that Plaintiff would be fit to work from January 1, 2014, and stating that a more detailed report was to follow. (Doc. 66-1 at 276, 283). On August 15, Plaintiff emailed the more detailed report to Johnson. (Doc. 66-1 at 284). That medical report, dated August 14, 2013, detailed Plaintiff's treatment and stated that Plaintiff "is doing well" and "is fit to resume his routine work." (Doc. 66-1 at 291-92). The documentation provided by Plaintiff and reviewed by Johnson showed that Plaintiff was fit to resume work and was under no travel restrictions as of August 14, 2013, at the latest, but did not intend to come back to work on August 15, 2013, the faculty start date. (Doc. 66-10 at 3).

After reviewing the documentation provided by Plaintiff and consulting with Steadman, Johnson reached his own conclusion and determined that Plaintiff's request for an additional period of leave was not medically necessary and would not be granted. (Doc. 66-3 at 8-10; Doc. 66-10 at 2). Johnson was the ultimate decision-maker. (Doc. 66-10 at 2). Neither Steadman nor Alam had authority to grant a leave of absence without pay. (Doc. 66-10 at 2-3). Nothing stated by Steadman influenced Johnson's decision. (Doc. 66-10 at 3).

Johnson was not aware of Steadman having any ill will or bad motive against Plaintiff. (Doc. 66-10 at 3). Even if he had been aware of any such animus, he would have made the same decision to deny Plaintiff's request for an extension of his leave and to terminate him when he did not report to work when his contract required. (Doc. 66-10 at 3). As Provost, Johnson had never granted more than one year leave of absence and doing so would have required extraordinary reasons. (*Id*.).

18

On August 20, 2013, Steadman replied to Plaintiff's August 15 email, stating that because Plaintiff was fit to work and had no travel restrictions, a leave of an entire semester was unnecessary and would not be considered reasonable. (Doc. 66-1 at 293). The email further stated that because leave had not been granted and Plaintiff did not return to work on August 15, the required start date for Engineering faculty, it was understood that Plaintiff would not be performing his faculty duties and was, therefore, deemed to have resigned his position at USA. (Doc. 66-1 at 293).

After receiving that email, Plaintiff requested a meeting with Steadman and Johnson when he was in the United States. (Doc. 66-1 at 172). Said meeting occurred on September 19, 2013. (Doc. 66-1 at 174). During the meeting, Plaintiff discussed his medical condition, his treatment, and his decision to continue being treated in Dubai, and he told Steadman and Johnson that he was there to claim his position back. (Doc. 66-1 at 174-79). After the meeting, on October 1, Steadman sent Plaintiff an email advising him that USA's position had not changed, and he was deemed to have resigned. (Doc. 66-1 at 299).

Plaintiff is the only faculty member that Steadman has recommended for even a one-year leave of absence. (Doc. 66-9 at 6). Previous to Plaintiff's leave, another ECE faculty member requested a second semester of leave after having been granted a one-semester leave, and Steadman recommended that his second leave request be denied and his appointment terminated. (Doc. 66-9 at 6; Doc. 79-12 at 13; Doc. 79-13 at 1). Plaintiff has no evidence of any College of Engineering faculty member being granted 18 months or more of leave. (Doc. 66-1 at 152). Since his appointment as Dean, Steadman

recommended and Plaintiff was granted more leaves of absence than any other College of Engineering faculty member. (Doc. 66-9 at 6).

## IV. **Analysis**

### A. *National Origin Claim*

Plaintiff alleges that the denial of his leave request, which resulted in him being deemed to have resigned in August of 2013, was the result of discrimination based on his national origin.[6] (Doc. 77 at 1).  Plaintiff may support his claim with direct evidence, circumstantial evidence, or statistical proof.  *Rioux v. City of Atlanta, Ga.,* 520 F.3d 1269, 1274 (11th Cir. 2008). Plaintiff has not alleged or submitted direct evidence or statistical proof in support of his claim. His claim of national origin discrimination is based solely on circumstantial evidence.

Where there is only circumstantial evidence of discrimination, courts apply the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing a prima facie case of national origin discrimination. *Id*. To establish a prima facie case of discriminatory termination, Plaintiff must show he was: 1) a member of a protected class; 2) qualified for his current position; 3) suffered an adverse employment action; and 4) replaced by someone outside his protected class or was treated less favorably than an individual outside of his protected class.  *Maynard v. Board of Regents of the Divs. of Univs. of Fla. Dept. of Ed.*, 342 F.3d 1281, 1289 (11th Cir. 2003); *Hinson v. Clinch Cty., Ga. Bd. of Ed.*, 231 F.3d

---

[6] Plaintiff does not argue mixed motive. S*ee Quigg v. Thomas Cty. School Dist.*, 814 F.3d 1227 (11th Cir. 2016).

821, 828 (11th Cir. 2000). Plaintiff concedes that he cannot make out a prima facie case. (Doc. 77 at 38). This is because he cannot show he was treated less favorably than a similarly situated employee outside his protected class or that he was replaced by someone outside his protected class.

However, the *McDonnell Douglas* framework is not the *sine qua non* for a plaintiff to survive summary judgment. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*. "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id*. (quoting *Silverman v. Bd. Of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)(footnote omitted)). "An inference 'is not a suspicion or a guess,' but rather 'a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact.'" *Knight v. Fourteen D Enters., Inc.*, 995 F. Supp. 2d 1311, 1334 (S.D. Ala. 2014)(quoting *Smith*, 644 F.3d at 1328 n. 25). In this case, Plaintiff is relying "solely on the 'convincing mosaic' theory" in support of his national origin discrimination claim. (Doc. 77 at 38).

As to Steadman's alleged national origin bias, there is some support in the record that Steadman wanted to hire more native-born applicants; Steadman's statement that he wanted to change the demographics of the College of Engineering and his alleged directive to the ECE faculty search committee in or about 2006 to 2007 to seek out

native-born, natural-English speaking applicants.[7] However, the record also shows that between the time of Steadman's hiring as Dean and the time of Plaintiff's termination, both native-born and foreign-born professors were hired, foreign-born professors were granted tenure, and foreign-born professors were given merit raises with Steadman's approval.

But even if Plaintiff could establish a convincing mosaic of Steadman's bias against Plaintiff's national origin, Plaintiff has presented absolutely no evidence that Johnson, the ultimate decision-maker, harbored any animus against Plaintiff based on his national origin. And, Johnson stated that he would have made the same decision to not extend Plaintiff's leave based on his independent review, regardless of Steadman's alleged bias. Plaintiff has failed to present any evidence to refute this.

Thus, an overall review of the facts, viewed in the light most favorable to Plaintiff, shows that he has failed to present sufficient evidence to create a convincing mosaic of circumstantial evidence from which a jury could reasonably infer that Defendant discriminated against him on the basis of his national origin.

Finally, even assuming arguendo that Plaintiff could establish a prima facie case, Defendant has proffered a legitimate, non-discriminatory reason for his termination which Plaintiff has failed to show is pretextual. Plaintiff has offered no evidence that the proffered reason is false, or that it was motivated by Plaintiff's national origin. Rather, Plaintiff argues that a "reasonable" and "prudent" employer would have extended a tenured professor's leave. "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer."

---

[7] At the time these alleged statements were made, there was one native-born professor and 13 foreign-born professors in the ECE department. (Doc. 77 at 7).

*Chapman*, 229 F.3d at 1030. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id*.

Plaintiff's argument concerning pretext is based on his personal conclusion that the two medical letters were confusing and that USA should have resolved the ambiguity before declining to extend his leave. However, the detailed medical summary made by Plaintiff's physician stated that he was fit to return to work as of August 14, 2013. It was not unreasonable for Johnson to rely on the letter as written. Put simply, Plaintiff has failed to satisfy his burden by producing sufficient evidence indicating that his termination was due to his national origin. As such, Defendant's motion for summary judgment as to Plaintiff's national origin discrimination claim is **GRANTED.**

### B. Retaliation Claim

Plaintiff asserts that Defendant, through Steadman, retaliated against him by denying his request for an extension of leave, which resulted in his termination. Pursuant to Title VII, an employer cannot discriminate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Where, as here, a plaintiff relies on circumstantial evidence to prove a Title VII retaliation claim, courts apply the burden shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Trask v. Secretary, Dept. of Veteran Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016). Under *McDonnell Douglas*, the plaintiff has the initial burden of

establishing a prima facie case of discrimination. *Id*. To establish a prima facie case of retaliation, the plaintiff must prove that: "(1) [he] engaged in statutorily protected conduct; (2) [he] suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Id.* at 1193-94. If the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises. *Id*. To rebut the presumption of discrimination, the employer must articulate a legitimate, nondiscriminatory reason for the action taken. *Id.* "If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." *Id*. "Title VII retaliation claims require proof that '[the] protected activity was a but-for cause of the alleged adverse action by the employer.'" *Id*. at 1194 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2534 (2013)).

As stated above, Plaintiff must first prove a prima facie case. Plaintiff alleges that he engaged in the following statutorily protected conduct: (1) complained that Steadman was a racist and made an allegation that native-born, English-speaking professors received greater raises than foreign-born professors at a faculty meeting in May of 2007; (2) gave a statement to an EEOC investigator in the fall of 2011 in connection with another professor's claim of discrimination against Steadman; and (3) met with a USA attorney in early 2012 concerning Steadman's actions, namely, the "changing the demographics" remark, the statements he made to the faculty search committee concerning hiring native-born, natural-English speaking professors and not considering applicants with H1B visas, and the cancellation of the research award. Defendant has not disputed that these actions constituted statutorily protected conduct. Viewing the evidence with regard to these claims in the light most favorable to Plaintiff, for purposes

of this motion, the Court will conclude that Plaintiff has met his burden with respect to the first element of a prima facie case.[8]

Likewise, the denial of Plaintiff's request for an extension of his leave and the resulting termination of his employment was an adverse employment action, and the parties do not dispute this.  *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006); s*ee also Whitt v. Baldwin Cty. Mental Health Ctr.*, Civ. A. No. 12-0698-WS-M, 2013 WL 6511856, at *18 (S.D. Ala. Dec. 12, 2013) ("[t]ermination is of course an adverse employment action").

To succeed on proving a prima facie case based on retaliation, Plaintiff must show that the above-described protected activities were causally related to the denial of his request for an extension of his leave, which denial then led to his termination. To satisfy this prong, Plaintiff must prove that "[the] protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). "That is, the employee must show that he would not have suffered the adverse action if he had not engaged in the protected conduct." *Long v. Ala. Dep't of Human Res.,* No. 15-10856, 2016 WL 3055829, at *9 (11th Cir. May 31, 2016).

---

[8] The Court has some doubts concerning whether all of these activities constitute statutorily protected conduct. "An employee's speech regarding unfair employment practices is statutorily protected speech if the employment practice is made unlawful by Title VII." *Gray v. Tri-County Elec. Membership Corp.*, Civ. A. No. 5:14-CV-225, 2016 WL 1181701, at * 11 (M.D. Ga. Mar. 25, 2016). The employee "must have a 'good faith, reasonable belief' that [the] employer has engaged in unlawful discrimination." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). It does not appear that all of the complaints Plaintiff expressed to USA's counsel in early 2012 qualified as statutorily protected speech versus venting about a Dean with whom he had differences. However, because Defendant has not challenged these three occurrences and because this issue is not determinative of the outcome on summary judgment, the Court will consider all three activities.

Although temporal proximity between the protected activity and the adverse action can establish an inference of retaliation, the temporal relationship must be very close. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). The Eleventh Circuit has held that a three-month gap between the protected conduct and adverse employment action is insufficient to establish causation on its own. *See Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004)(citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001)). Moreover, "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon*, 393 F.3d at 1220.

"To establish a causal connection, a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013)(quoting *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)). Johnson has testified that he was the ultimate decision-maker with regard to the denial of Plaintiff's leave. There is no evidence that Johnson was aware of any of the alleged protected activity.  Moreover, although there is evidence that Steadman was aware of the complaints Plaintiff made in 2007 and 2008, there is no evidence that Steadman was aware of Plaintiff's interview with an EEOC investigator in 2011 or his meeting with counsel for USA in 2012. Plaintiff presumes that Steadman knew, but a presumption by the plaintiff is not sufficient to prove knowledge by the defendant.

Protected activity that occurred in 2007 and 2008 is too remote from the adverse employment action in 2013 to establish causation.  However, even if Plaintiff had

set forth prima facie proof of discriminatory retaliation, his claim would fail. Defendant has articulated a legitimate, non-retaliatory reason for his termination.  Specifically, Defendant denied Plaintiff's request for an extension of his leave because Johnson and Steadman received a medical report stating that Plaintiff was able to travel and to return to work prior to the date slated for faculty to return for the fall semester.

To overcome Defendant's showing of a legitimate, non-retaliatory reason for his termination, Plaintiff must show that the reason was a pretext for prohibited, retaliatory conduct. An employer's reasons may be shown to be pretextual "by revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [its] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Grp.,* 509 F.3d 1344, 1348 (11th Cir. 2007) (internal quotation omitted).  However, a reason cannot be a "pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (internal quotation omitted).  If the reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must "meet that reason head on and rebut it…." *Chapman*, 229 F.3d at 1030. Pretext must be proven with "concrete evidence in the form of specific facts…." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).  "Conclusory allegations and assertions" will not suffice.  *Id*.  That an employer's decision was subjective, or that it was based on an unwritten or informal policy subject to differing interpretations, without more, does not show that it was pretextual.  *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1501 (11th Cir. 1985). "When a plaintiff chooses to attack the veracity of the employer's proffered reason, '[the] inquiry is limited to whether

the employer gave an honest explanation of its behavior.'" *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1310-1311 (11th Cir. 2012)(quoting *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir, 1991)).

For the reasons stated *supra,* Plaintiff fails to offer sufficient evidence to support a finding that Defendant's reason for the denial and subsequent termination was pretextual. In sum, there is insufficient evidence before the Court indicating that Defendant's denial of Plaintiff's leave request and his resulting deemed resignation was in retaliation for any protected activity.  Thus, Defendant's motion for summary judgment on Plaintiff's retaliation claim is **GRANTED.**

## V.  Conclusion

For the reasons stated herein, it is **ORDERED** that Defendant's Motion for Summary Judgment (Doc. 65) is **GRANTED.** It is further **ORDERED** that Defendant's Evidentiary Objections to Plaintiff's Summary Judgment Response and Declaration (Doc. 87) is **SUSTAINED in part, OVERRULED in part** and **MOOT in part,** as detailed *supra*.

A Final Judgment consistent with the terms of this Order shall be entered by separate document as required by Rule 58 of the *Federal Rules of Civil Procedure.*

**DONE** and **ORDERED** this **3rd** day of **November 2016.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**